THOMAS v DEPARTMENT OF STATE HIGHWAYS

Docket No. 55185. Argued June 4, 1974. Reargued April 7, 1976
(Calendar No. 7).—Decided November 23, 1976.

Robert E. Thomas, Jr., was killed by falling earth while tunneling
under a railroad viaduct as he was engaged in highway con-
struction work. At the time of his death he was an employee of
Gale Crushed Concrete and Aggregate, Inc., a subcontractor of
Ministrelli Construction Company. The State Highway Commis-
sion had entered a contract with Ministrelli for the widening of
State Trunkline Highway M-102 where it passes beneath the
Grand Trunk Western Railroad viaduct in the City of Detroit.
The decedent's widow and children brought an action against
the Department of State Highways in the Court of Claims,
Charles A. Wickens, J., alleging that decedent's death resulted
from the state's negligence in failing to supervise and inspect
the digging out of the dirt beneath the viaduct. The state was
granted summary judgment. The Court of Appeals, T. M.
Burns, P. J., and McGregor and Van Valkenburg, JJ., affirmed
on grounds of sovereign immunity (Docket No. 16022). Plaintiffs
appeal, claiming that application of the doctrine of sovereign
immunity to defeat their action against the defendant violates
the equal protection clauses of the United States and Michigan
Constitutions. *Held:*

1. "Governmental function" is a term of art which was
adopted and used by courts to describe those activities of
government which due to their public nature should not give
rise to liability at common law. The Legislature, by adopting
the common-law term in the statutory language without includ-
ing a statutory definition, intended that activities regarded as
governmental functions at common law at the time of enact-
ment would enjoy statutory immunity from tort liability.

REFERENCES FOR POINTS IN HEADNOTES

[1–4, 6–12, 14, 15, 17–19] 57 Am Jur 2d, Municipal, School, and State
Tort Liability §§ 42–44.

72 Am Jur 2d, States, Territories, and Dependencies §§ 99–125.

[5] 24 Am Jur 2d, Dismissal, Discontinuance, and Nonsuit §§ 6, 18, 28.

[13] 16 Am Jur 2d, Constitutional Law §§ 8, 13, 200, 201.

[16] 16 Am Jur 2d, Constitutional Law § 48 *et seq.*

2. Much of the task of determining the limits of governmental immunity has been returned to the courts. They, looking to precedent, must decide case by case which activities may be classified as governmental functions.

3. Maintenance and improvement of a highway has clearly been found by prior decisions to be a governmental function. Therefore, the defense of governmental immunity is available to the state in this case under the immunity statute.

Affirmed.

Chief Justice Kavanagh and Justice Fitzgerald, with Justice Levin concurring, dissented. They would hold that whether an act of a governmental agency is a governmental function, in which the state is immune, is decided by viewing the precise action allegedly giving rise to liability, and determining whether the action is *sui generis* governmental, *i.e.,* of essence to governing. The line of distinction will most often be between decisional and planning aspects of governmental duties on the one hand and operational aspects on the other. Supervision of a digging operation on a highway construction project, an operational aspect, is not a governmental function. The governmental tort immunity act, MCLA 691.1401 *et seq.;* MSA 3.996(101) *et seq.,* does not here bar suit against the state.

Justice Levin also dissented in a separate opinion. In addition to holding that the activity in suit is not a governmental function, he would hold that the governmental tort liability act is violative of the Equal Protection Clause insofar as it purports to confer immunity on the state and other units of government for tortious acts committed in the performance of functions that have a counterpart in the private sector and for which private persons are subject to tort liability. Equal protection is not offended to the extent the act confers immunity for functions which are peculiarly governmental and without counterpart in the private sector. Governmental immunity for all governmental activity is not an inherent or implied attribute of government embedded in the Constitution, otherwise it could not be waived by the Legislature. Statutes immunizing functions of government from tort liability are subject to explicit and implicit constitutional limitations and to judicial review when challenged as unconstitutional. The imperative of equal protection of the laws is a limitation on the legislative power to carve out exceptions to the law, and a classification which immunizes particular persons and operations from a general rule of tort liability should be closely examined to determine both whether it is reasonable and whether it bears a reasonable relationship to the object of the general rule of liability. The

legislative classification excepting government generally from responsibility for the tortious acts of its employees bears no relationship whatever to any of the objectives of the judge-made general rule of liability.

### Opinion of the Court

1. States—Torts—Governmental Immunity—Governmental Function.

The key to determining the applicability of the governmental immunity defense is in ascertaining whether or not the particular governmental activity involved is a "governmental function" (MCL 691.1407; MSA 3.996[107]).

2. States—Torts—Governmental Immunity—Governmental Function—Statutes—Construction.

The Legislature, in choosing the precise term "governmental function", a term of art adopted and used by the courts to describe those activities of government which should not give rise to tort liability at common law, without a statutory definition to describe the limits of governmental immunity, intended that activities described as governmental functions at common law at the time of enactment of the new legislation would enjoy statutory immunity from tort liability (MCL 691.1407; MSA 3.996[107]).

3. States—Torts—Governmental Immunity—Highways—Governmental Function.

The repair, maintenance, improvement and construction of a highway was regarded as a governmental function under common-law governmental immunity decisions and is therefore a governmental function under the immunity statute; the defense of governmental immunity is available to the state in a suit for damages arising out of an injury to an employee of a subcontractor engaged in construction of a state highway (MCL 691.1407; MSA 3.996[107]).

### Dissenting Opinion

Kavanagh, C. J., and Levin and Fitzgerald, JJ.

4. States—Torts—Governmental Immunity—Highways.

*The state was not immune from liability where plaintiffs' decedent, an employee of a subcontractor engaged in the construction of a state highway, was killed by falling earth while tunneling under a railroad right-of-way and plaintiffs brought an action against the State Highway Department, alleging that*

the decedent's death resulted from the state's negligence in failing to supervise and inspect the digging out of dirt beneath a railroad viaduct (MCL 691.1401 et seq.; MSA 3.996[101] et seq.).

5. DISMISSAL AND NONSUIT—SUMMARY JUDGMENT—ISSUE OF FACT—HIGHWAYS—SUBCONTRACTORS—DUTY TO SUPERVISE.

An issue of whether defendant Department of State Highways had control or supervision of a highway construction tunneling operation in which an employee of a subcontractor was killed and an issue of whether the tunneling operation was such inherently dangerous activity as would give rise to a legal duty on the defendant's part to supervise and control the tunneling operation are issues which, being factual disputes, do not admit of disposition by summary judgment.

6. STATES—TORTS—GOVERNMENTAL IMMUNITY.

The legislative grant of governmental tort immunity does not extend to services performed by the government that are not essentially "governmental" (MCL 691.1401 et seq.; MSA 3.996[101] et seq.).

7. STATES—GOVERNMENTAL IMMUNITY—GOVERNMENTAL FUNCTION.

A function is not "governmental" for purposes of the governmental immunity statute unless the particular activity that the function entails is uniquely associated with those activities having no common analogy in the private sector because they reflect the imperative element in government, the implementation of its right and duty to govern; "governmental function" is decided by viewing the precise action allegedly giving rise to liability, and determining whether such action is sui generis governmental (MCL 691.1401 et seq.; MSA 3.996[101] et seq.).

8. STATES—TORTS—GOVERNMENTAL IMMUNITY—GOVERNMENTAL FUNCTION.

A government is immune, for purposes of the governmental immunity statute, only when it is planning and carrying out duties which, due to their peculiar nature, can only be done by a government; the mere fact that a governmental agency is doing a certain act does not make the act a "governmental function" if a private person or corporation may undertake the same act.

9. STATES—TORTS—GOVERNMENTAL IMMUNITY—GOVERNMENTAL FUNCTION.

The line of distinction of a "governmental function" for purposes of the governmental immunity statute will most often be

*between decisional and planning aspects of governmental duties on the one hand, and operational aspects on the other.*

10. STATES—HIGHWAYS—GOVERNMENTAL IMMUNITY—GOVERNMENTAL
    FUNCTION.

    *No exercise or discharge of a governmental function was involved in an act alleged to have been negligently performed by the State Highway Department, supervision of a digging operation on a highway construction project; therefore, there was no governmental immunity (MCL 691.1401 et seq.; MSA 3.996[101] et seq.).*

DISSENTING OPINION

LEVIN, J.

See headnotes 4 and 10.

11. STATES—TORTS—GOVERNMENTAL IMMUNITY—CONSTITUTIONAL
    LAW—EQUAL PROTECTION—GOVERNMENTAL FUNCTION.

    *The governmental tort liability act violates the Equal Protection Clause insofar as it purports to confer immunity on the state and other units of government for tortious acts committed in the performance of functions that have a counterpart in the private sector and for which private persons are subject to liability (US Const, Am XIV, § 1; Const 1963, art 1, § 2; MCL 691.1401 et seq.; MSA 3.996[101] et seq.).*

12. STATES—TORTS—GOVERNMENTAL IMMUNITY—CONSTITUTIONAL
    LAW—EQUAL PROTECTION—GOVERNMENTAL FUNCTION.

    *The Equal Protection Clause is not offended by the governmental tort liability act to the extent that it confers immunity from liability for torts for functions which are peculiarly governmental and without counterpart in the private sector (US Const, Am XIV, § 1; Const 1963, art 1, § 2; MCL 691.1401 et seq.; MSA 3.996[101] et seq.).*

13. CONSTITUTIONAL LAW—GOVERNMENTS—SOVEREIGNTY.

    *The basic premise on which the state and Federal governments are organized is that all power of government is derived from the people; these governments are not absolute sovereigns, but have only those powers conferred on them by the people (Const 1963, art 1, § 1).*

14. STATES—TORTS—GOVERNMENTAL IMMUNITY—CONSTITUTIONAL
    LAW.

    *Governmental immunity from liability for tort arises implicitly under the Constitution only to the extent that it is necessary to*

the free exercise of the powers of governance; it is not an inherent or implied attribute of governmental power embedded in the Constitution, but if it were, it could not be waived by the Legislature and the provisions of the governmental tort liability act would be either redundant or unconstitutional.

15. STATES—TORTS—GOVERNMENTAL IMMUNITY—CONSTITUTIONAL LAW.

Laws may be enacted in the exercise of the legislative power creating and modifying the tort liability of all persons and entities for particular conduct and functions; functions which are peculiarly governmental and without counterpart in the private sector may be immunized from such liability.

16. CONSTITUTIONAL LAW—EQUAL PROTECTION—STATUTES—COMMON LAW.

The imperative of equal protection of the laws is a limitation on the legislative power to carve out exceptions to both common and statutory law.

17. STATES—TORTS—GOVERNMENTAL IMMUNITY—EQUAL PROTECTION— CLASSIFICATION.

The legislative classification excepting government generally from responsibility for the tortious acts of its employees bears no relationship whatsoever to the objectives of the general judge-made rule of liability.

18. STATES—TORTS—GOVERNMENTAL IMMUNITY—EQUAL PROTECTION— COST.

The cost to government of tort liability does not justify a classification immunizing government from a general rule of liability where private operators are able to operate and pay the cost and the cost imposed on government for like operations would be comparable.

19. STATES—TORTS—GOVERNMENTAL IMMUNITY.

Until the Legislature enacts a governmental tort liability law that confines immunity to functions which are peculiarly governmental and without counterpart in the private sector, it is the responsibility of the Supreme Court to uphold the rule of law, the most basic premise of which is that the state, rather than being above the law, is the creature of and subject to it.

*Wines, Branch, Bachmann, Brown & Prost,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, and *Louis J. Caruso* and *Francis J. Carrier,* Assistants Attorney General, for defendant.

Amici Curiae:

*Robert Reese,* Corporation Counsel, and *John E. Cross* and *Maureen P. Reilly,* Assistants Corporation Counsel, for the City of Detroit.

*Lopatin, Miller, Bindes & Freedman* (by *Victoria C. Heldman* and *F. Lee Bailey)* for Michigan Trial Lawyers Association.

*Michael F. Schmidt* for the Council of the Negligence Section, State Bar of Michigan, in favor of governmental immunity.

*Neal Bush* and *Kenneth M. Mogill* for the Council of the Negligence Section, State Bar of Michigan, in opposition to governmental immunity.

WILLIAMS, J. *(to affirm).* This case concerns government immunity from liability for tort.[1] Such immunity may arise either from judicial policy or

---

[1] The California Law Revision Commission, after thorough and thoughtful examination of the governmental immunity problem, concluded that the doctrine did have validity in some instances:

"Government cannot merely be made liable as private persons are, for public entities are fundamentally different from private persons. Private persons do not make laws. Private persons do not issue and revoke licenses to engage in various professions and occupations. Private persons do not quarantine sick persons and do not commit mentally disturbed persons to involuntary confinement. Private persons do not prosecute and incarcerate violators of the law or administer prison systems. Only public entities are required to build and maintain thousands of miles of streets, sidewalks and highways. Unlike many private persons, a public entity often cannot reduce its risk of potential liability by refusing to engage in a particular activity, for government must continue to govern and is required to furnish services that cannot be adequately provided by any other agency. Moreover, in our system of government, decision-making has

legislation. This case does not involve judicially created but rather legislatively created immunity.

On appeal the question raised by the Court of Claims grant of summary judgment is whether the facts pled in this case, the death of an employee of a subcontractor who was engaged in the construction of a state highway when he was killed by falling earth when tunneling under a railroad right-of-way, deal with a "case[s] wherein the government agency is engaged in the exercise or discharge of a governmental function" as provided by statute.[2]

We hold that the facts as pled deal with a "case[s] wherein the government agency is engaged in the exercise or discharge of a governmental function" as defined by common-law precedent at the time of the enactment of the pertinent governmental immunity statute and affirm the Court of Appeals.

## I—GOVERNMENTAL IMMUNITY STATUTE

The legislative provision for governmental immunity is contained in MCLA 691.1407; MSA 3.996(107). This section provides:

"Except as in this act otherwise provided, *all government agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the*

been allocated among three branches of government—legislative, executive and judicial—and in many cases decisions made by the legislative and executive branches should not be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions." 4 Cal Law Revision Comm Report, Recommendations and Studies, 810 (1963).

[2] 1970 PA 155. This act validated 1964 PA 170, declared unconstitutional because of title defect by *Maki v East Tawas,* 385 Mich 151; 188 NW2d 593 (1971).

*exercise or discharge of a governmental function.* Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed." (Emphasis added.)

To this general grant of immunity the Legislature has enacted certain exceptions[3] none of which here is applicable.

The key to determining the applicability of the immunity defense is in ascertaining whether or not the particular case is one "wherein the * * * agency is engaged in the exercise or discharge of a governmental function".

The term "governmental function" is nowhere defined in the statute. However, this does not mean that we have been left with no guidelines in determining what the Legislature intended by adopting this particular phraseology.

"Governmental function" is a term of art which has been used by the courts of this state to describe those activities of government which due to their public nature should not give rise to liability at common law. Through many years of application, the label of governmental function has been attached to a number of governmental activities.

Words and phrases which have acquired meaning in the common law are interpreted as having the same meaning when used in statutes dealing with the same subject matter as that which they were associated at the common law. 2A Sutherland Statutory Construction (3d ed, Sands), § 50.03,

---

[3] These exceptions include: MCLA 691.1402; MSA 3.996(102), failure to keep highways fit and safe for travel; MCLA 691.1405; MSA 3.996(105), negligent operation of motor vehicles; and MCLA 691.1406; MSA 3.996(106), dangerous and defective building. In addition MCLA 691.1413; MSA 3.996(113) provides that immunity shall not apply in those instances in which the performance of a "proprietary function" is involved.

pp 277–278. See *People v Den Uyl,* 320 Mich 477, 486; 31 NW2d 699 (1948).

It is therefore reasonable to conclude that the Legislature, in choosing the precise terminology of "governmental function" to describe the limits of governmental immunity, intended that activities described as governmental functions at common law at the time of enactment of the new legislation would enjoy *statutory* immunity from tort liability.

The historical context in which the governmental immunity statute was enacted suggests that the Legislature, alarmed at the prospects of liability for government activities previously protected, sought to restore the immunity enjoyed by municipalities prior to *Williams v Detroit,* 364 Mich 231; 111 NW2d 1 (1961), and to codify the state's existing immunity to insulate governmental entities from tort liability.[4]

The Legislature accomplished this goal by employing a term, "governmental function", which served to mark the boundaries of common-law immunity, and used it to set the limits of statutory immunity.

This conclusion is supported by the language employed in MCLA 691.1407; MSA 3.996(107). This section provides in pertinent part:

"Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immu-

---

[4] After the Supreme Court in *Williams* abolished the judicial doctrine of governmental immunity, a bill to restore the defense was drafted by a special committee of the Michigan Association of Municipal Attorneys and supported by the Michigan Municipal League. That proposed legislation was eventually enacted into law as 1964 PA 170. One drafter of the legislation stated:

" 'The net effect of Act 170, 1964 is to largely return to municipal corporations the position they enjoyed prior to the decision of the *Williams* case.' " 28 NIMLO Municipal L Rev 432, 464 (1965).

nity of the state from tort liability as it existed heretofore, which immunity is affirmed."[5]

Obviously this language must be construed as an "affirmation" of case-law precedent on the subject of the state's immunity.

## II—STATE WAS ENGAGED IN A "GOVERNMENTAL FUNCTION"

Given that the Legislature intended activities regarded as governmental functions under common law should be considered governmental functions under the statute, the question becomes whether under the facts the Department of State Highways at the time of decedent's fatal injury was engaged in the exercise or discharge of a "governmental function" under common-law immunity.

The question whether or not a government agency was engaged in a governmental function will not always be easily answered. In many instances governmental activities have never been examined in terms of whether they constitute governmental function and in others the case-law precedent is less than clear. In those cases the courts will be forced to adapt case-law precedent as best they can and will no doubt be called upon to use their own creative genius to resolve the case. However, in this case, prior court decisions have clearly established that the activity involved —the maintenance and improvement of a highway —is a governmental function.

---

[5] It was firmly established that state agencies were only entitled to immunity while they were engaged in a "governmental function". *See Manion v State Highway Commissioner*, 303 Mich 1, 19; 5 NW2d 527 (1942); *Daszkiewicz v Detroit Board of Education*, 301 Mich 212, 220; 3 NW2d 71 (1942). *See also Bofysil v Department of State Highways*, 44 Mich App 118, 124–126; 205 NW2d 222 (1972).

In *Gunther v Board of County Road Commissioners of Cheboygan County,* 225 Mich 619, 631; 196 NW 386 (1923), this Court held:

"Our former decisions as well as the great weight of authority sustain the contention of defendants' counsel and the holding of the trial judge that in this work [maintenance and repair of highways] the counties are discharging a governmental function and in the absence of statute are immune from liability for their negligence or that of their agent in carrying on this work."

See *In re Claim of Moross,* 242 Mich 277, 281; 218 NW 683, *cert den* 278 US 635; 49 S Ct 32; 73 L Ed 552 (1928) ["construction, maintenance and repair of a highway are governmental function"] and *Johnson v Board of County Road Commissioners of Ontonagon County,* 253 Mich 465, 468; 235 NW 221 (1931).[6]

Confronted by the uniformity and clarity with which prior case law has treated the repair, maintenance and construction of highways as a governmental function it is difficult to conclude other than that the activity involved in this case must be regarded as a governmental function under the statute and that as a result the defense of governmental immunity is available to the State Highway Department.[7]

### III—Conclusion

The result reached in this decision is the result

---

[6] The plaintiff in *Gunther* was not an employee working on the road, but a person traveling on the highway. However, the Court cited the case of *Fisher v Delaware Twp,* 87 Kan 674; 125 P 94 (1912) in which an employee who sustained injuries while performing work on a highway was barred from recovery by the doctrine of governmental immunity.

[7] The Kavanagh/Fitzgerald opinion is correct in stating that the activity in question is not a "proprietary function" as defined in MCLA 691.1413; MSA 3.996(113). *See Thomas v Department of State Highways,* 398 Mich 1, 18, fn 7; 247 NW2d 530 (1976).

mandated by the governmental immunity statute as it presently exists.

This statute is not as precise or pervasive as it could be. The practical effect of the Legislature's decision to establish governmental immunity in the manner it has chosen is to return much of the task of determining the limits of governmental immunity to the courts. Under the present statutory scheme the judiciary, looking to past precedents (which in many cases are less than clear), must decide on a case-by-case basis which activities may be classified as governmental functions and thus entitled to immunity. Until such judicial decisions are made, which may not be until a number of years have passed, those who must try to live with this statute will encounter many areas of doubt as to whether a given activity is or is not a governmental function. Such confusion could be more quickly relieved by more specific legislative guidelines.[8]

Under the guise of "judicial refinement," the KAVANAGH/FITZGERALD opinion has sought to impose rather novel standards for governmental immunity. For example, the opinion suggests that if a police commission plans a particular type of war on crime, that is a governmental function, but if a

---

[8] In its summary and recommendations to the Governor and Legislature the California Law Revision Commission cogently expressed the need for effective legislation in this area:

"There is an immediate need, therefore, for the enactment of comprehensive legislation stating in considerable detail the extent to which public entities will be liable.

\* \* \*

"The resulting certainty will be of benefit both to public entities and to persons injured by governmental activities. If the limits of potential liability are known, public entities may plan accordingly, may budget for their potential liabilities, and may obtain realistically priced insurance. Meritorious claims will not be resisted in the hope that the appellate courts will create an additional immunity; and unmeritorious claims will not be pressed in the hope that an existing immunity will be curtailed or that liability will be extended beyond previously established limits." 4 Cal Law Revision Comm Report, *supra,* 809 (1963).

police officer under that plan performs the traditional police function of arresting a criminal, that is not a governmental function.[9] This certainly does not in any way correspond to the meaning the Legislature intended.

Under the governmental immunity statute as it presently is constituted, the common law and common sense indicate that the state was engaged in a governmental function at the time decedent was fatally injured and thus the state is entitled to raise the defense of governmental immunity until the Legislature enacts a governmental immunity law holding otherwise.

The Court of Appeals is affirmed. No costs, a public question.

COLEMAN, LINDEMER, and RYAN, JJ., concurred with WILLIAMS, J.

KAVANAGH, C. J., and FITZGERALD, J. Plaintiffs' decedent, an employee of a subcontractor, was engaged in the construction of a state highway

---

[9] Professor Cooperrider, cited by some of my colleagues to support their treatment of governmental immunity, acknowledges that the issue of liability for harm caused by law enforcement is an extremely complex question which should be dealt with through specific legislation. He states:

"[T]he governmental-function defense negates liability for harms caused by law enforcement and by protective actions of employees such as policemen, firemen, inspectors, and custodial employees, who are by law compelled to act directly upon persons and property, overcoming resistance if necessary. Mistakes are an inevitable consequence of such activity, and it may be that resultant losses should, to some extent, be absorbed by the community, but the problems of separating instances where compensation would be appropriate from those in which it would not is complex, and it is difficult to see how, with any fidelity to language, it could be held that these employments are anything but governmental. I would suppose, therefore, that if there is to be liability in this area it should come through legislation, wherein the criteria and the limits can be specified, and the basic policy questions resolved in the appropriate forum." Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan*, 72 Mich L Rev 187, 283–284 (1973).

when he was killed by falling earth when tunneling under a railroad right-of-way. This action was originally brought in the Court of Claims alleging, *inter alia,* negligence of the State Highway Department.[1] Summary judgment was entered for the defendant. That judgment was affirmed by the Court of Appeals.

On appeal to this Court, plaintiffs raise three issues. Only the third issue deals with the constitutionality and construction of the governmental immunity act, 1964 PA 170; MCLA 691.1401 *et seq.;* MSA 3.996(101) *et seq.*[2] We conclude that in this case, on the basis of the statutory language, the state is not immunized from liability. We do not reach the other issues raised as they are not ripe for appellate resolution.

In their complaint plaintiffs contended that defendant was negligent in failing to 'supervise the

---

[1] Plaintiffs specifically allege that decedent's death resulted from the state's negligence in failing "to supervise and inspect the digging out of dirt beneath the Grand Trunk Railroad viaduct". Ministrelli Construction Company, a construction contractor, had entered into a written contract with the Michigan State Highway Commission for a highway reconstruction project involving the widening of state trunkline highway M-102 where it passes beneath the railroad viaduct. At the time of his death decedent was an employee of Gale Crushed Concrete and Aggregate, Inc., a subcontractor selected by Ministrelli to perform work on the project.

MCLA 247.651a; MSA 9.1097(1a), imposes the responsibility for state trunkline highway construction and maintenance upon the State Highway Commission which is granted jurisdiction over all state trunkline highways by Const 1963, art 5, § 28.

MCLA 250.62; MSA 9.902, and MCLA 247.807; MSA 9.216(7) authorize the Highway Commission to contract for the construction, improvement and maintenance of highways under its jurisdiction or to do such work with its own forces on state account.

[2] MCLA 691.1407; MSA 3.996(107) was originally § 7 of 1964 PA 170. This section was later held unconstitutional on the grounds that it exceeded the scope of the title of the act. *Maki v East Tawas,* 385 Mich 151; 188 NW2d 593 (1971). The Legislature cured the unconstitutionality by modifying the act's title in 1970 PA 155 and reenacted MCLA 691.1407; MSA 3.996(107) with only stylistic changes. *See* Cooperrider, *Torts, 1971 Ann Survey of Mich Law,* 18 Wayne L Rev 503, 518–523 (1971).

digging out of the dirt beneath the Grand Trunk Railroad viaduct', enumerating six instances of such negligence. Defendant did not file an answer but rather immediately filed a motion for summary judgment. In this motion defendant asserted that plaintiffs had 'failed to state a claim upon which relief can be granted', pointing to the fact that plaintiffs' decedent was an employee of a subcontractor and not under the supervision and control of defendant. At the hearing on defendant's motion for summary judgment, defendant relied upon both governmental immunity and the asserted fact that defendant had no control or supervisory authority over plaintiffs' decedent. The trial court apparently granted summary judgment on both bases. The Court of Appeals resolved the case in favor of defendant on the basis of governmental immunity.

On appeal before this Court, defendant again urges that summary judgment was appropriate because defendant had no control or supervision of the tunneling operation in which plaintiffs' decedent was killed. Plaintiffs also argue, for the first time on appeal, that defendant breached a statutory duty to supervise and control the tunneling operation and also that the tunneling operation was such 'inherently dangerous' activity as would give rise to a legal duty on defendant's part to supervise and control the tunneling operation.

There has been no factual development in this case. Had the grant of summary judgment been premised alone on resolution of these issues we would have been obliged to reverse because these issues, being factual disputes, do not admit of summary disposition. They must be fully developed and determined at a trial.

In *Williams v Detroit,* 364 Mich 231, 250; 111

NW2d 1 (1961), four members of an eight-person Court, speaking through Justice (now Judge) ED-WARDS, stated:

"From this date forward the judicial doctrine of governmental immunity from ordinary torts no longer exists in Michigan."[3]

The Legislature subsequently enacted 1964 PA 170. That statute, as amended by 1970 PA 155, now reads, at § 7:

"Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged *in the exercise or discharge of a governmental function.* Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed." (Emphasis supplied.) (Compiled as MCLA 691.1407; MSA 3.996[107].)[4]

The state's governmental function immunity of § 7 does not apply to any action "arising out of the

[3] *Williams* was interpreted to be limited to municipal corporations in *McDowell v State Highway Commissioner,* 365 Mich 268; 112 NW2d 491 (1961).

[4] In this case there is question whether a "governmental function" of the *state* rather than a municipality is involved. This distinction arguably has significance in light of the second sentence of MCLA 691.1407; MSA 3.996(107). We do not, however, construe this sentence to be an "affirmation" of case-law precedent preserving for all time state governmental immunity heretofore recognized by case law. To read it in such a manner would be to assume that the Legislature failed to recognize that the evolution of case-law precedent is exclusively committed to the judicial branch of government. We rather find that by the last sentence of the section it was intended that the governmental immunity act was not to be construed in such a way as to alter, unless so indicated by express statutory provision, state governmental immunity as recognized by case-law precedent existing at the time of enactment. Such precedent no longer has force in light of our decision in *Pittman v City of Taylor,* 398 Mich 41; 247 NW2d 512 (1976)

[state's] performance of a proprietary function" defined as "any activity which is conducted primarily for the purpose of producing a pecuniary profit for the state, excluding, however, any activity normally supported by taxes or fees". MCLA 691.1413; MSA 3.996(113).

In contrast with this specific definition of "proprietary function", the act does not define "exercise or discharge of a governmental function". Because "exercise or discharge of a governmental function" has no fixed meaning, and is not defined in the statute, the phrase is "presumably subject to judicial refinement".[5] This fact would seem evident because the term governmental function is historically of judicial origin.[6] We perceive in this lack of a precise legislative definition an intention to leave to the judiciary the task of defining a somewhat amorphous concept in concrete factual settings. The question in the instant case, therefore, becomes one of statutory interpretation: Was the State of Michigan, by contracting out work on a highway construction project, engaged in the exercise or discharge of a governmental function, thus immunizing it from tort liability? We hold that it was not so engaged, and thus is not immune.

A broad definition of "exercise or discharge of a governmental function" would leave that phrase without any meaning of substance in the context of the governmental tort immunity act.[7] As the

[5] Cooperrider, *The Court, The Legislature, and Governmental Tort Immunity in Michigan,* 72 Mich L Rev 187, 282 (1973).

[6] Cooperrider, *supra.* Legislative draftsmen no doubt took this historical background into account in framing the statute. Section 7 of the governmental tort immunity act was drafted against a background of judicial precedent which presumed immunity and predicated liability only upon exceptions to the general rule. This "presumption" of case-law precedent is changed by our decision in *Pittman v City of Taylor, supra.*

[7] In the past, analysis of this statute and case law has generally

scope of governmental activity increases, the government performs many services that are not essentially "governmental". The legislative grant of tort immunity does not extend to these governmental activities. "[T]here is nothing governmental about the activities of a doctor employed on the staff of a public, rather than a private hospital, nor about the activities of a worker employed on a street project, rather than on building a private driveway for a private employer."[8]

If "governmental function" were deemed to insu-

suggested a dichotomy between immune "governmental function" on one hand and non-immune "proprietary" function on the other—that is, if an activity was not one, it was the other. *See* Cooperrider, *supra,* and the majority opinion in *Pichette v Manistique Public Schools,* 50 Mich App 770; 213 NW2d 784 (1973), and the general discussion appearing at 2 Harper and James, The Law of Torts, § 29.6, pp 1619–1627. While we cannot in this case seriously regard plaintiffs' argument that defendant's activity was "proprietary", we do reject, for purposes of statutory construction, the rigid dichotomy of the past. In our view, an activity which is not proprietary in nature does not necessarily fit the governmental function classification. This principle was recognized in *Lykins v People's Community Hospital,* 355 F Supp 52 (ED Mich, 1973), and in the dissenting opinion in *Pichette, supra. See also, Spencer v General Hospital of the District of Columbia,* 138 US App DC 48; 425 F2d 479 (1969); *Elgin v District of Columbia,* 119 US App DC 116; 337 F2d 152 (1964).

The argument that exposure of the government to particular liabilities would cause financial deprivation and governmental bankruptcy is not a persuasive reason for judicial liberality in defining "governmental function". By providing liability for the negligent operation of motor vehicles (MCLA 691.1405; MSA 3.996[105]), defective maintenance of roads (MCLA 691.1402; MSA 3.996[102]), and faulty maintenance of public buildings (MCLA 691.1406; MSA 3.996[106]), the Legislature has exposed the state's governmental units to frequent and costly liability. The Legislature also allowed the governmental units to settle claims or to indemnify employees for claims made against them while acting within the scope of their public employment (MCLA 691.1408; MSA 3.996[108]), and to purchase liability insurance (MCLA 691.1409; MSA 3.996[109]). *See, also, Williams v Detroit,* 364 Mich 231, 258–259; 111 NW2d 1 (1961).

[8] Cooperrider, fn 5 *supra,* 284. Similar observations have led a Federal district judge of the Eastern District of Michigan to observe that Equal Protection considerations dictate a narrow construction of "governmental function" in this statute. *Lykins,* fn 7 *supra.* We agree that a broader interpretation might present such problems. *See Brown v Wichita State University,* 217 Kan 279; 540 P2d 66 (1975).

late all governmental activities for which liability is not expressly provided in the statute, the phrase would not describe the nature of the activity involved, and would not only be irreconcilable with the historical tradition of governmental responsibility, but in fact governmental irresponsibility would be fostered if "governmental function" were simply equated with "governmental participation", and the victims' right to recovery depended solely upon the identity of the tortfeasor rather than on the nature of the function being performed. The policy reasons which motivated the Legislature to institute governmental immunity cannot be given such an irrational interpretation.[9]

Mr. Justice Jackson, dissenting in *Dalehite v United States,* 346 US 15, 57; 73 S Ct 956; 97 L Ed 1427 (1953), succinctly stated the policy basis and practical necessity of governmental immunity: "[I]t is not a tort for government to govern". That is also the essence of the Michigan governmental immunity statute. Exposure to liability necessitating judicial inquiry into the essential workings of all branches of government is unacceptable in our constitutional system. Professor Kenneth Culp Davis notes the "utter impracticality" of trying to make governmental units liable in damages for all the harm they do the interests of individuals and corporations:

---

[9] The entire concept of governmental immunity has come under broad attack on numerous grounds. *See, e.g.,* Littlejohn, *Torts, 1974 Ann Survey of Mich Law,* 21 Wayne L Rev 665–666 (1975):

"The continuation of plaintiff 'sacrifices' offered in the name of governmental immunity is without doubt the most deplorable circumstance in Michigan jurisprudence. * * * As a legal policy, governmental immunity from tort liability is immoral and legally unjustifiable. In a purportedly enlightened society that requires its citizens to pay lawful judgments or within ordinary prudence, requires them to insure against unreasonable risks of harm to others, governmental immunity is an embarrassing anomaly."

*See also,* 2 Harper & James, § 29.3, pp 1611–1612, and the analysis of this Court in rejecting the common-law rule of state governmental immunity in *Pittman v City of Taylor, supra.*

"A city should not be liable for damages done by a zoning ordinance, which necessarily reduces the value of some property. Nor should the state be liable to the seller of a harmful drug if it enacts a statute prohibiting further sale of the drug, thereby destroying a profitable business." 3 Davis, Administrative Law Treatise, § 25.11, p 484.

The test then, of "governmental function" for purposes of the immunity statute, must be phrased in terms of the nature of the specific function. We conclude that a function is not "governmental" in this context unless the particular activity that this function entails is uniquely associated with those activities having "no common analogy in the private sector because they reflect the imperative element in government, the implementation of its right and duty to govern".[10] Thus, a government is immune only when it is planning and carrying out duties which, due to their peculiar nature, can only be done by a government. The mere fact that a governmental agency is doing a certain act does not make such act a "governmental function" if a private person or corporation may undertake the same act. Thus, "governmental function" is not delineated by questions of the broad scope of an activity undertaken or by financial or insurance considerations which may be indicative of a governmental undertaking, but rather by viewing the precise action allegedly giving rise to liability, and determining whether such action is *sui generis* governmental—of essence to governing. Supervision of road construction (as opposed to the making of decisions as to whether to build a road), operation of hospitals and schools (as opposed to planning or deciding what health services to offer

---

[10] Cooperrider, fn 5 *supra,* 287.

or what subject to teach), operation and supervision of playgrounds and swimming pools (as opposed to deciding whether to operate such playgrounds or pools) are not governmental functions within this definition.[11] On the other hand, certain aspects of the exercise of the executive, legislative, or judicial powers are by their very nature governmental functions and necessarily removed from the undertakings of the private sector. In this regard, we agree with the California Law Revision Commission:

"Decisions of legislators to enact or not to enact legislation; decisions of prosecutors to prosecute or not to prosecute persons suspected of crime; decisions of judges to grant or not to grant judgment for a particular party—these and other comparable types of governmental activity are examples of the kinds of functions which imperatively require complete independence from threat of tort consequences to insure their fearless and objective performance." 5 Cal Law Revision Comm Report, Recommendations and Studies, 281, 282 (1963).

The parameter of "governmental function" will most often run along the line of distinction between decisional and planning aspects of governmental duties on the one hand, and operational aspects on the other. See 3 Davis, Administrative Law Treatise, § 25.10, pp 476–482.[12] In this case,

---

[11] This definition of governmental function is only given in regard to the governmental immunity act here considered. We intend no such definition in other contexts, *e.g.,* civil rights cases requiring state action, etc. *See, e.g., Moose Lodge No. 107 v Irvis,* 407 US 163; 92 S Ct 1965; 32 L Ed 2d 627 (1972); *Burton v Wilmington Parking Authority,* 365 US 715; 81 S Ct 856; 6 L Ed 2d 45 (1961).

[12] In *Downs v United States,* 522 F2d 990 (CA 6, 1975), the United States Court of Appeals adopted a similar view of 'discretionary function' immunity under the Federal Tort Claims Act. That Court held that immune 'discretionary functions' were only those functions which involved policy formulation. The Court went on to conclude on the facts that the government was not immune from liability as a result of FBI actions which allegedly caused a hijacker to shoot several hostages during the course of a hijacking episode.

where an operational aspect of the governmental road-building activity is involved, we find no governmental immunity because no exercise or discharge of a governmental function was involved in the act alleged to have been negligently performed, *i.e.*, supervision of a digging operation on a highway construction project.

The analysis is similar to that of the United States Court of Appeals for the District of Columbia in *Elgin v District of Columbia*, 119 US App DC 116, 118; 337 F2d 152, 154 (1964):

"With kings replaced by city councils as the embodiments of the grace by which men permit themselves to be governed, this alertness was verbalized in somewhat different terms, but the core of the judicial insight remained the same. It is, we believe, essentially this: If a king, or a city council, is to do the job of governing well, then there is something to be said for withholding the threat of answerability in damages for at least some of the actions and decisions which governing necessarily entails. He who rules must make choices among competing courses of action and in the face of conflicting considerations of policy. The capacity and the incentive to govern effectively are arguably not enhanced by the

We recognize, as did the California Supreme Court in *Johnson v State,* 69 Cal 2d 782, 794; 73 Cal Rptr 240, 248; 447 P2d 352, 360–361 (1968), that

"Our proposed distinction, sometimes described as that between the 'planning' and 'operational' levels of decision-making *(cf. Dalehite v United States, supra,* 346 US 15, 35–36 [73 S Ct 956; 97 L Ed 1427, 1440–1441], however, offers some basic guideposts, although it certainly presents no panacea. Admittedly, our interpretation will necessitate delicate decisions; the very process of ascertaining whether an official determination rises to the level of insulation from judicial review requires sensitivity to the considerations that enter into it and an appreciation of the limitations on the court's ability to reexamine it. Despite these potential drawbacks, however, our approach possesses the dispositive virtue of concentrating on the reasons for granting immunity to the governmental entity. It requires us to find and isolate those areas of quasi-legislative policy making which are sufficiently sensitive to justify a blanket rule that courts will not entertain a tort action alleging that careless conduct contributed to the governmental decision."

prospect of being sued by those citizens who may be adversely affected by the choice eventually made. Thus it has been thought wise to sweep this restrictive cloud from the horizon and to let those responsible for the conduct of public affairs calculate their courses of action free of this intimidating influence. By the same token, in those areas of governmental action where the reason for the rule does not apply, the rule itself is disregarded."

In *Spencer v General Hospital of the District of Columbia,* 138 US App DC 48, 57–58; 425 F2d 479, 488 (1969) (Wright, J., concurring), the opinion in *Elgin, supra,* was discussed in a manner which has application to our focus on the nature of the particular activity being performed by the governmental agency in determining whether immunity exists:

"Drawing on two recent cases, the court discerned a shift from a 'governmental-proprietary' to a 'discretionary-ministerial' distinction. Where the previous distinction had rested on a vertical classification of broad areas of activity—education, sanitation, care of the sick, etc.—as 'governmental' or 'proprietary,' the new distinction was a horizontal one which cut across these broad areas, and looked with more particularity at the act or omission complained of as negligent. Where the injury proximately resulted from a deliberate choice in the formulation of official policy, characterized by a high 'degree of discretion and judgment involved in the particular governmental act', immunity would remain. To inquire into such decisions in a tort suit might 'jeopardiz[e] the quality and efficiency of government itself,' and endanger the creative exercise of political discretion and judgment through 'the inhibiting influence of potential legal liability asserted with the advantage of hindsight.' On the other hand, where the injury was inflicted by negligent official acts or omissions other than in the formulation of public policy—'ministerial acts'—liability could be asserted. Thus in 'the execution

of policy as distinct from its formulation,' the District of Columbia could be held to the duty of reasonable care which the courts had long enforced against individuals and private associations." (Footnotes omitted.)

Our holding that the State of Michigan is not immune in this case under § 7 of the governmental immunity act in no way addresses the actual merits concerning the alleged negligence of the state. All we hold is that the governmental tort immunity act does not here bar suit against the state.

Reversed and remanded. No costs, a public question.

LEVIN, J., concurred with KAVANAGH, C. J., and FITZGERALD, J.

LEVIN, J. *(dissenting)*. The Court today, in *Pittman v City of Taylor,* 398 Mich 41; 247 NW2d 512 (1976), abrogates the common-law doctrine of sovereign or governmental immunity.

In this case it holds that the governmental tort liability act[1] bars an action against the State Highway Department for negligence in allegedly failing to supervise and inspect the work of a highway construction contractor resulting in the death of plaintiffs' decedent, an employee of the contractor.

I agree with the Chief Justice and Justice FITZGERALD that the obligation of an owner to supervise and inspect a road under construction is not a governmental function within the meaning of the governmental tort liability act and, accordingly, sign their dissenting opinion.

I do not agree with their statement that the constitutional issues are not ripe for appellate resolution. The Court's construction of the term

---

[1] MCLA 691.1407; MSA 3.996(107).

"governmental function" requires consideration of the constitutional challenge to the validity of the act.

The practical effect of today's decisions is to retain governmental immunity. The judge-made rule has been abolished but the legislative authority to restore the common-law doctrine has not been scrutinized. Under a different guise, the discredited doctrine of governmental immunity carries on.

I would hold the governmental tort liability act violative of the Equal Protection Clause insofar as it purports to confer immunity on the state and other units of government for tortious acts committed in the performance of functions that have a counterpart in the private sector and for which private persons are subject to liability. Equal Protection is not, however, offended to the extent immunity is conferred for functions which are peculiarly governmental and without counterpart in the private sector.

I

Whatever may be the origin of the doctrine of sovereign or governmental immunity,[2] neither the individual states nor the United States possesses the attributes of sovereignty once ascribed to monarchs.[3] The basic premise on which the state and

[2] See, e.g., Borchard, Government Liability in Tort (Parts I, II, III), 34 Yale L J 1, 129, 229 (1924–25); (Parts IV, V, VI), 36 Yale L J 1, 757, 1039 (1926–27); Cooperrider, The Court, The Legislature, and Governmental Tort Liability in Michigan, 72 Mich L Rev 187, 281–282 (1973).

[3] "The reason for this long-continued and growing injustice in Anglo-American law rests, of course, upon a medieval English theory that 'the King can do no wrong,' which without sufficient understanding was introduced with the common law into this country, and has survived mainly by reason of its antiquity. The facts that the conditions which gave it birth and that the theory of absolutism which

Federal governments are organized is that all power of government is derived from the people; this concept is expressed in the Michigan Constitution: "All political power is inherent in the people."[4]

In ratifying the Constitution of the United States, the states "granted"[5] Congress specific powers and conferred on the Federal government only those powers enumerated in the Constitution.[6] Similarly, under the Constitution of this state the people, in whom "all political power" inheres, have conferred on the state not all political power, but rather "[t]he powers of government [which] are divided into three branches; legislative, executive and judicial",[7] subject to express and implied limitations. However broad may be the grant of legislative power, the Legislature, in contrast with the English Parliament, is not omnipotent.

"[W]ith the Parliament rests practically the sovereignty of the country, so that it may exercise all the powers of the government if it wills so to do; while on the other hand the legislatures of the American States are not the sovereign authority, and, though vested with the exercise of one branch of the sovereignty, they are nevertheless, in wielding it, hedged in on all sides

kept it alive in England never prevailed in this country and have since been discarded by the most monarchical countries of Europe, have nevertheless been unavailing to secure legislative reconsideration of the propriety and justification of the rule that the State is not legally liable for the torts of its officers." Borchard, *supra,* 34 Yale L J 1, 2.

[4] Const 1963, art 1, § 1.

[5] US Const, art 1, § 1.

[6] "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." US Const, Am X.

[7] Const 1963, art 3, § 2. "The legislative power of the State of Michigan is vested in a senate and a house of representatives", Const 1963, art 4, § 1, "[t]he executive power" in the Governor, Const 1963, art 5, § 1, the "judicial power" in one court of justice, Const 1963, art 6, § 1.

by important limitations, some of which are imposed in express terms, and others by implications which are equally imperative." 1 Cooley, Treatise on Constitutional Limitations (8th ed), p 173.[8]

Certain powers and limitations are implied from the language and structure of a written constitution.[9] Immunity from tort liability for all governmental activity is not an inherent or implied attribute of governmental power embedded in the Constitution; if it were, the Legislature would not possess the power to waive such constitutionally conferred immunity—all the provisions of the governmental tort liability act would be either redundant or unconstitutional.[10]

Governmental immunity arises implicitly under the Constitution only to the extent it is necessary

---

[8] "The strong language in which the complete jurisdiction of Parliament is here described is certainly inapplicable to any authority in the American States, unless it be to the people of the States when met in their primary capacity for the formation of their fundamental law; and even then there rest upon them the restraints of the Constitution of the United States, which bind them as absolutely as they do the governments which they create." 1 Cooley, Treatise on Constitutional Limitations (8th ed), pp 174–175.

[9] C Black, Structure and Relationship in Constitutional Law (Baton Rouge, La, Louisiana State University Press, 1969).

[10] The governmental tort liability act provides for actions against a governmental agency that fails to "maintain the highway in reasonable repair so that it is reasonably safe and convenient for public travel", MCLA 691.1402; MSA 3.996(102), for negligent operation of a motor vehicle, MCLA 691.1405; MSA 3.996(105), and failure to "repair and maintain public buildings" and "damage resulting from a dangerous or defective condition of a public building if the governmental agency had actual or constructive knowledge of the defect and, for a reasonable time after acquiring knowledge, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition", MCLA 691.1406; MSA 3.996(106).

The act further provides that "[t]he immunity of the state shall not apply to actions to recover for bodily injury or property damage arising out of the performance of a proprietary function as herein defined. Proprietary function shall mean any activity which is conducted primarily for the purpose of producing a pecuniary profit for the state, excluding, however, any activity normally supported by taxes or fees." MCLA 691.1413; MSA 3.996(113).

to the free exercise of the powers of governance. The Governor and the members of the Legislature and of the judiciary may not be called upon in a court of law to answer for the manner in which they exercise the discretionary and decisional governmental powers conferred upon them.

In the exercise of the legislative power, laws may be enacted creating and modifying the tort liability of all persons and entities for particular conduct and functions; functions which are peculiarly governmental and without counterpart in the private sector may be immunized from such liability.

Governmental immunity not being an inherent attribute of governmental power, statutes immunizing from tort liability functions of government are subject to explicit and implicit constitutional limitations and to judicial review when challenged as unconstitutional.

II

In this case, the plaintiff contends that the state, as the owner of a project under construction, is subject to liability for failing to supervise and inspect the work of a contractor.

In *Pittman, supra,* the plaintiff contends that a school district, as the employer of a school teacher, is subject to liability for physical injury to a student caused by the teacher's negligence.

In *McCann v Michigan,* 398 Mich 65; 247 NW2d 521 (1976), it is contended that the state, as the owner of a hospital, is liable under the doctrine of *respondeat superior* for the acts of supervisory and other employees who intimidated advertisers and others resulting in the demise of a newspaper critical of the hospital management.

At common law, liability may be imposed on the owner of a construction project for failing to supervise and inspect the work of a contractor, on the operator of a school for the negligence of a teacher, and on an employer for the intentional torts of an employee committed within the scope of the employment.

The Constitution of this state, paralleling the Fourteenth Amendment, provides that "No person shall be denied the equal protection of the laws".[11]

Although the bases of tort liability here asserted rest on judge-made rules of law, not statute, the imperative of equal protection of the laws is a limitation on the legislative power to carve out exceptions to both common and statutory law.[12]

The application in this case of the legislatively conferred immunity means that the family of a construction worker killed by a cave-in may maintain an action against a private owner of property

[11] Const 1963, art 1, § 2. "[N]or shall any State * * * deny to any person within its jurisdiction the equal protection of the laws." US Const, Am XIV, § 1.

[12] "That the action of state courts and judicial officers in their official capacities is to be regarded as action of the State within the meaning of the Fourteenth Amendment, is a proposition which has long been established by decisions of this Court. That principle was given expression in the earliest cases involving the construction of the terms of the Fourteenth Amendment. Thus, in *Virginia v Rives,* 100 US 313, 318 [25 L Ed 667, 669] (1880), this Court stated: 'It is doubtless true that a State may act through different agencies,— either by its legislative, its executive, or its judicial authorities; and the prohibitions of the amendment extend to all action of the State denying equal protection of the laws, whether it be action by one of these agencies or by another.' In *Ex parte Virginia,* 100 US 339, 347 [25 L Ed 676, 679] (1880), the Court observed: 'A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way.' In the *Civil Rights Cases,* 109 US 3, 11, 17 [3 S Ct 150; 27 L Ed 835, 839, 841] (1883), this Court pointed out that the Amendment makes void 'State action of every kind' which is inconsistent with the guaranties therein contained, and extends to manifestations of 'State authority in the shape of laws, customs, or judicial or executive proceedings.' Language to like effect is employed no less than *eighteen times during the course of that opinion.*" *Shelley v Kraemer,* 334 US 1, 14–15; 68 S Ct 836; 92 L Ed 1161 (1948).

for negligence in failing to supervise and inspect, but not if the owner is the state. Recognizing such immunity for school districts would mean that students attending private schools have a cause of action against the school for physical injury caused by the negligence of a teacher, while those attending a public school would not. Depending on how the interrelationship between the legislatively conferred immunity and the doctrine of *respondeat superior* is ultimately resolved, recognizing this legislatively conferred immunity may mean that a person injured by an intentional tort committed by an employee within the scope of his employment may recover from a private employer, but not if the employer is the state.

### III

The question here is not whether the Legislature has impermissibly drawn a line where it appears that some line must be drawn but whether there is justification for a classification which carves out of a general rule of law, imposing on employers liability for the tortious acts of their servants, an immunity for a discrete and privileged class of employers.

Whether or not the peculiar advantages possessed by politically powerful units of state and local government in pressing on the Legislature their claims for immunity require "strict scrutiny" of a classification immunizing them from liability for the tortious acts of their employees, such a classification should be carefully examined to determine both whether it is reasonable and whether it bears a reasonable relationship to the objectives of the general rule of liability.

Here the general rule of liability is judge-made and serves to provide a means of redressing civil

wrongs, compensating victims and deterring intentional tortfeasors. The legislative classification excepting government generally from responsibility for the tortious acts of its employees bears no relationship whatsoever to any of those objectives.

The apparent rationale for governmental immunity is that imposition of liability may inhibit governmental activity and would be costly. Concern that imposition of liability would inhibit the performance of the governmental function is entirely valid where the decisions to be made are peculiarly governmental in nature. For this reason neither the state, the Governor, nor individual members of the Legislature or of the judiciary, can be held accountable in a court of law for the manner in which they exercise their discretionary and decisional powers of governance.

There is nothing about the operation of a state highway department, a public school or a state hospital that differs from their counterparts in the private sector so that imposition of tort liability for those governmental operations would inhibit them in a manner not experienced in the private sector. Imposing on governmental operations the same exposures and restrictions as are experienced without disfunction by private operators has no impact on the governing function.

Whether cost may ever justify governmental immunity need not be decided. It does not justify a classification immunizing government from a general rule of liability where private operators are able to operate and pay the cost and the cost imposed on government for like operations would be comparable.

There is no reason to suppose that the managers of the State Highway Department have less capacity to supervise and inspect their construction

projects than private operators, that teachers working in school districts are more negligent or cause more injuries to their students than those working in private schools,[13] or that the state has less ability to control supervisory employees of a state hospital than, say, the board of trustees of a private hospital. The cost to the State Highway Department, school districts, and state hospitals resulting from the imposition of liability should be no greater than the burden now borne by private operators. Government is not impecunious or disadvantaged in comparison to private operators.

To be sure, money paid for tort damage is not available for other governmental purposes. This is also true of funds required to be paid under the Equal Protection Clause to furnish free transcripts and provide assigned counsel for indigent persons. This is not, again, a case of drawing a line concerning the scope of a governmental program or of regulating competing groups in society but of a preference for a highly organized, politically powerful force which asserts, so far successfully, that it, in contrast with all other operators performing like functions, should be relieved of bearing a cost otherwise imposed by law on enterprises engaged in such functions.

The impact on government resulting from the imposition of tort liability in terms of reduced options on the use of money does not differ from the impact on private operators who must take into consideration in drawing their budgets the need to finance the cost of their tort liability exposures.

If the Legislature were to abolish the tort liabil-

---

[13] A classification favoring incompetent operators to preserve their ability to compete would raise substantial issues under both the Equal Protection and Due Process Clauses.

ity of all owners of construction projects or the liability for negligence of all schools, or the tort of interference with business and economic relations or the responsibility of all employers for the intentional torts of their employees, a different question would be presented. The protection of the law would have been withdrawn but arguably not the equal protection of the laws.

IV

The Court refers to the comment of the California Law Revision Commission and its conclusion that "Government cannot merely be made liable as private persons are, for public entities are fundamentally different from private persons". The point is entirely valid but it does not support the constitutionality of the classifications in these consolidated cases.

To be sure, "private persons do not make laws". It is not suggested that the state is subject to tort liability for losses caused by the enactment of a statute. If the statute exceeds the constitutional law-making power of the Legislature, aggrieved persons have a remedy in the courts.

"Private persons do not issue and revoke licenses to engage in various professions and occupations." True, and again, in general, there is a judicial remedy for failure to issue or revoke a license.

"Private persons do not quarantine sick persons and do not commit mentally disturbed persons to involuntary confinement." Again, in general, there is a judicial remedy for improper action.

"Private persons do not prosecute and incarcerate violators of the law or administer prison systems." No one can be prosecuted or incarcerated

except in accordance with a statutory scheme designed to protect innocent persons from conviction.

The power to commit and incarcerate does not confer authority to mistreat inmates. To the extent the argument of the California Law Revision Commission presupposes that inmates may be subjected to mistreatment without recourse, it ignores other limitations on the powers of government which, whether or not enforced, nevertheless obtain.

"Only public entities are required to build and maintain thousands of miles of streets; sidewalks and highways." In this instance, the state has responded and provided for liability for improper construction and failure to maintain a safe and convenient means of travel.[14] This is therefore no longer an issue.

"Unlike many private persons, a public entity often cannot reduce its risk of potential liability by refusing to engage in a particular activity, for government must continue to govern and is required to furnish services that cannot be adequately provided by any other agency. Moreover, in our system of government, decision-making has been allocated among three branches of government—legislative, executive and judicial—and in many cases decisions made by the legislative and executive branches should not be subject to review in tort suits for damages, for this would take the ultimate decision-making authority away from those who are responsible politically for making the decisions."

Indisputably, government must govern. In Mr. Justice Jackson's famous phrase, "it is not a tort

---

[14] *See* fn 10, *supra.*

for government to govern."[15] It is not suggested that there should be tort liability for acts of governance.

The argument that government cannot refrain from engaging in activities in which it now engages is not without dispute. Many view with dismay the increasing tendency of government to do things that the people could do for themselves.

While the exercise of the discretionary and decisional powers of governance is peculiarly governmental, many activites in which government now engages could, arguably, be performed just as well or better by private persons with government providing funds to the extent it is thought that governmental subvention is appropriate.[16]

There are even those who think that it would be better if government withdrew from the business of providing educational services, either reducing or eliminating school taxes or providing the parents of school-age children with chits usable in private schools. Whether this is a good idea is beside the point. While it is traditional for government to provide educational services, education is not a peculiarly governmental function. Neither is contracting or the design or supervision of a construction project or the operation of a mental health hospital a peculiarly governmental function. Private persons operate in all three sectors.

---

[15] *Dalehite v United States,* 346 US 15, 57; 73 S Ct 956; 97 L Ed 1427 (1953) (opinion by Jackson, J.).

[16] Government pays for much of the health care services provided to a large percentage of the population but does not employ the physicians and nurses, and builds and runs few of the hospitals in which such services are rendered.

Government pays for legal services for indigent defendants and other persons who are required to respond in state-initiated and prosecuted legal proceedings. If these services were to be provided through a public defender they would not thereby become governmental in nature.

The constantly increasing scope of governmental activity is a reason for reconsidering old assumptions about the justification for governmental immunity, not for adhering to old labels and concepts:

"[T]he Crown or State is constantly enlarging the scope of its activities and the number of its servants; and there is a powerful political party which proposes to increase them indefinitely. If their dream be ever realized the whole machinery of industry and trade will be controlled by the State or Crown; almost every citizen will be in the King's employ; almost every motor-van will be driven by a servant of the Crown; and at every turn of life the maxim that the King can do no wrong will, if it still survives, be operative. The laundry-woman who spoils our shirts, the grocer who gives us false measure, the journalist who defames us will all be servants of the Crown; and it will be impossible to pursue their employers in the Courts. It will be idle too for the ordinary citizen (if any remain) to found a claim for justice on the splendid promises of Magna Carta or the Bill of Rights." A P Herbert, *Uncommon Law,* "Bold v Attorney-General," (London, Methuen & Co, 1935), pp 294–295 (footnote omitted).

The prospect of thousands of individuals acting on behalf of a government which is unaccountable to its citizenry for injuries negligently and intentionally caused surely cannot be reconciled with the rule of law, which this Court is bound to uphold.

There are, of course, borderline cases where the issue of imposition of tort liability on government would be doubtful. Where governmental employees "are by law compelled to act directly upon persons and property, overcoming resistance if necessary",[17] it may be difficult to draw the line between

[17] Cooperrider, *supra,* 72 Mich L Rev 187, 283.

exercise of discretion for which there can be no
liability and activity for which there may be recov-
ery.

Separating exercise of discretion from activity
for which there may be recovery is, indeed, com-
plex, and considerable deference should be given to
carefully drawn legislation which seeks to draw
the line. While the Legislature is in a position to
address the entire subject matter comprehensively,
the Court should not hold in abeyance the consti-
tutional challenge awaiting a legislative solution
at some remote future time.

V

The Court concludes "that the activity involved
in this case must be regarded as a governmental
function". This narrow holding is accompanied by
the statement that the Legislature has chosen "to
return much of the task of determining the limits
of governmental immunity to the courts. Under
the present statutory scheme the judiciary, looking
to past precedents (which in many cases are less
than clear), must decide on a case-by-case basis
which activities may be classified as governmental
functions and thus entitled to immunity. Until
such judicial decisions are made, which may not be
until a number of years have passed, those who
must try to live with this statute will encounter
many areas of doubt as to whether a given activity
is or is not a governmental function. Such confu-
sion could be more quickly relieved by more legis-
lative guidelines."

There is no need to leave the citizens of the
state, who "live with this statute", in "doubt" for
"a number of years" whether a given activity is or
is not immune. This Court is now holding in
abeyance over 25 cases presenting a panorama of

activities which makes it possible to clarify at an early date the extent of the impolicy of the decision this day rendered.

I can think of no more important responsibility of this Court at this time than to grant leave to appeal in those cases and declare whether the victims of the torts there alleged are without remedy against the governmental employer of the persons who committed them.

Among the abeyance cases are actions against city and state hospitals for medical malpractice; school districts for injuries to children; city and county road commissions for negligent design and maintenance; state and county institutions for injuries suffered by inmates due to defects in design, maintenance and supervision; a city for the death of a child due to negligence in the maintenance of a drain; cities for alleged intentional torts of police officers.

In addition, hundreds of cases are being held in the circuit courts awaiting clarification by this Court. It is not responsible to advise these litigants that this Court suggests that the Legislature reconsider the question.

The constitutional issues presented by this case and the abeyance cases should be addressed and resolved by this Court now.

Under the act, it appears that the elementary school classroom and the hospital room, when operated by government, may become virtual "free fire" zones in which governmental employees may act negligently without the governmental employer being responsible under circumstances that would unquestionably generate liability if the employer were a non-governmental entity.

Until the Legislature enacts a governmental tort liability law that confines immunity to functions

which are peculiarly governmental and without counterpart in the private sector, it is our responsibility to uphold the rule of law, the most basic premise of which is that the state, rather than being above the law, is the creature of and subject to it.[18]

[18] "One of the first actions of a loyal young Englishman who begins to study the law of the land is to read carefully the pages which are concerned with the King; and he learns with some surprise the ancient constitutional and legal principle that the King can do no wrong. He is surprised for this reason; that the whole course of his historical studies at school has led him to believe that at the material dates of English history the King was always doing wrong. Leaving out of account the past hundred years or more, in which our country has been blessed with monarchs of blameless character and reputation, the kings whose names are most firmly fixed in the national memory are those who continually did wrong, whether in a constitutional, political, social, moral, or religious sense; and I am quite sure that the familiar names of John, Charles, James, and Henry are at this moment present in your Lordships' minds. It is not too much to say that the whole Constitution has been erected upon the assumption that the King not only is capable of doing wrong but is more likely to do wrong than other men if he is given the chance. To this hypothesis we owe the Great Charter, the Petition of Right, the Bill of Rights, the Act of Settlement, the Habeas Corpus Act, the doctrine of Ministerial responsibility, the independence of the judiciary, the very existence of the two Houses of Parliament, and indeed, all the essential pillars in the noble fabric of the Constitution.

"It is odd, then, that this maxim should survive in a political system which was invented to contradict it, and that our forefathers, who were compelled to rebel against the practice, should have reverently retained the principle. For in origin, I suspect, these words were not so much a testimony to royal infallibility as a convenient excuse for royal misfeasance." A P Herbert, *Uncommon Law,* "Bold v Attorney-General" (London, Methuen & Co, 1935), pp 292–293.