ROSS v CONSUMERS POWER COMPANY

Docket No. 78-2140. Submitted April 9, 1979, at Lansing.—Decided
November 19, 1979. Leave to appeal applied for.

Michael Ross was injured when a construction vehicle near which
he was working came in contact with power lines maintained
by Consumers Power Company. Ross was an employee of a
construction company which was building a drain for the John
Saines Project 1 Drainage District. Ross brought a negligence
action against Consumers. Consumers brought a third-party
action against the Drainage District and Wendell Gee, Jackson
County Drain Commissioner. The third-party complaint alleged
that the third-party defendants negligently failed: to notify
Consumers that work was being undertaken that could inter-
fere with the power lines, to make arrangements with Consum-
ers to safeguard workers from contact with the power lines, to
instruct and warn its contractors concerning the power lines, to
hire a properly licensed and competent contractor and to
adequately supervise and inspect the project in such a manner
as to prevent the accident from occurring. Consumers' third-
party complaint further alleged breach of certain contractual
obligations arising out of the easement granted to the Drainage
District so that the drain could pass across land owned by
Consumers. The third-party defendant Drainage District moved
for summary and accelerated judgment. Third-party defendant
Gee moved for summary judgment. The Jackson Circuit Court,
Charles J. Falahee, J., granted third-party defendant Gee's
motion for summary judgment on the basis that statutory
liability rested with the drainage district rather than the drain
commissioner and granted summary third-party defendant
Drainage District's motion for summary judgment on the basis
of governmental immunity. The Drainage District's motion for
accelerated judgment was denied. Consumers settled with Ross
in the principal action. Consumers appeals from the order

REFERENCES FOR POINTS IN HEADNOTES

[1] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 60.
[2, 5] 73 Am Jur 2d, Summary Judgment § 4.
[3, 4] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 27.
[6] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 28.

granting summary judgment to third-party defendant Drainage District. *Held:*

1. Governmental immunity in Michigan is now a statutory creature, the Supreme Court having progressively abrogated the common-law doctrine of governmental immunity.

2. The statute creating immunity for governmental agencies engaged in the exercise or discharge of a governmental function speaks only of immunity from tort liability. It was, therefore, erroneous for the trial court, on the basis of governmental immunity, to grant summary judgment in favor of the Drainage District with respect to the counts in the third-party complaint which sounded in contract.

3. The use of the term "governmental function" by the Legislature in the statute granting immunity from tort liability to governmental agencies engaged in the exercise or discharge of a governmental function is not a mere codification of the common-law meaning of that term. The meaning of the term "governmental function" as used in the governmental immunity statute is subject to continuing judicial refinement.

4. Governmental immunity from tort liability applies only to activities of the government that are of the essence of governing. It was, therefore, error for the trial court to grant summary judgment in favor of the Drainage District with respect to the tort counts, since the construction of a drain is not of the essence of governing and is neither of such a unique character nor governmentally mandated in such a manner that it can be effectively accomplished only by the government.

5. In today's social climate, it can no longer be said that the need to protect the government from tort liability outweighs the need to protect the interests of individuals injured by torts caused by governmental agencies. It is only where the action of the government is of the essence of governing, or of such a unique character that only the government can effectively accomplish the act, that the government should be protected from liability for its torts.

Reversed and remanded.

1. TORTS — GOVERNMENTAL IMMUNITY — STATUTES — COMMON LAW.
    Governmental immunity in Michigan is now a statutory creature, the Supreme Court having progressively abrogated the common-law doctrine of governmental immunity.

2. JUDGMENT — SUMMARY JUDGMENT — GOVERNMENTAL IMMUNITY — CONTRACTS — STATUTES.
    The granting of summary judgment in favor of a drainage district

on the ground of governmental immunity as to counts sounding in contract is error, since the statute creating immunity for governmental agencies engaged in the exercise or discharge of a governmental function speaks only of immunity from tort liability (MCL 691.1407; MSA 3.996[107]).

3. TORTS — GOVERNMENTAL IMMUNITY — WORDS AND PHRASES — "GOVERNMENTAL FUNCTION" — COMMON LAW — STATUTES.

The Legislature's use of the term "governmental function" in the statute granting immunity from tort liability to governmental agencies engaged in the exercise or discharge of a governmental function does not merely codify the common-law meaning of that term, but rather, that term is subject to judicial refinement (MCL 691.1407; MSA 3.996[107]).

4. TORTS — GOVERNMENTAL IMMUNITY — ESSENCE OF GOVERNING.

Governmental immunity from tort liability applies only to activities of the government that are of the essence of governing.

5. TORTS — GOVERNMENTAL IMMUNITY — DRAINAGE DISTRICTS — SUMMARY JUDGMENT.

It is error to grant summary judgment in favor of a drainage district on the basis of governmental immunity as to a third-party claim alleging negligent failure by the drainage district to notify an electric power company of work being undertaken near power lines and/or failure to take the actions necessary to insure the safety of persons working on the project, since the construction of a drain is not of the essence of governing and is neither of a unique character nor governmentally mandated in such a manner that it can be effectively accomplished only by the government.

6. TORTS — GOVERNMENTAL IMMUNITY — PUBLIC POLICY.

The need to protect the government from tort liability is outweighed by the need to protect the interest of individuals where the tort arises out of a function which is not necessary to the act of governing and which can be effectively accomplished by others.

*W. E. Wisner* and *James E. Brunner,* for third-party plaintiff.

*Parker & Adams, P.C.,* for third-party defendant.

Before: V. J. BRENNAN, P.J., and BRONSON and CYNAR, JJ.

BRONSON, J. Third-party plaintiff, Consumers Power Company (Consumers), appeals as of right the trial court's grant of summary judgment in favor of third-party defendant John Saines Project 1 Drainage District (District) on the grounds of governmental immunity.

On August 24, 1971, Michael Ross was electroshocked and severely injured when a construction vehicle near which he was working came in contact with electric power lines maintained by Consumers. At the time, Ross was an employee of Dunigan Brothers, Inc., the construction firm that was building the drain. Ross sued Consumers, and the case was eventually settled. On October 18, 1977, Consumers filed an amended third-party complaint against the District and Wendell Gee, the Jackson County Drainage Commissioner at the time of the incident, alleging essentially a three-count cause of action. Two of the counts were in contract, and the third was in tort. The District's motion for summary judgment was granted, the trial court holding that the District was immune from tort liability based on the doctrine of governmental immunity.[1] The issue on appeal is whether the trial court was correct in according the District the shield of governmental immunity.

# I

Governmental immunity in Michigan is now a statutory creature, the Supreme Court having pro-

---

[1] The trial court also granted summary judgment in favor of Wendell Gee on the ground that he was an improper party defendant. This ruling is not challenged on appeal.

gressively abrogated the common-law doctrine.[2] The statute provides that "[e]xcept as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function". MCL 691.1407; MSA 3.996(107). The statute speaks only to immunity from *tort* liability; it does not grant immunity from contract claims. Accordingly, the trial court's grant of summary judgment as to the two contract counts is reversed and the cause is remanded to the trial court.[3]

The crucial issue we must decide in determining whether the District is protected from liability on the tort count is whether the alleged acts and omissions of the District were part of the "exercise or discharge of a governmental function". The Legislature's use of the common-law term "governmental function" was originally thought to signal a legislative intent to have the statute codify the common-law meaning of that term as of the date of the statute's enactment. *Thomas v Dep't of State Highways,* 398 Mich 1; 247 NW2d 530 (1976). In two recent Supreme Court cases, however, this

---

[2] *Pittman v City of Taylor,* 398 Mich 41; 247 NW2d 512 (1976), *Keenan v County of Midland,* 377 Mich 57; 138 NW2d 759 (1966), *McDowell v State Highway Comm'r,* 365 Mich 268; 112 NW2d 491 (1961), *Williams v Detroit,* 364 Mich 231; 111 NW2d 1 (1961).

For a history of the origin and development of governmental immunity in Michigan, see Fox, *The King Must Do No Wrong: A Critique of the Current Status of Sovereign and Official Immunity,* 25 Wayne L Rev 177 (1979), Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan,* 72 Mich L Rev 187 (1973).

[3] There were numerous other issues before the trial court that could conceivably have formed the basis for a grant of summary judgment on the contract claims. The trial court's opinion, however, addresses only the governmental immunity issue in granting summary judgment in favor of the District. We will not in this circumstance speculate as to other possible grounds for the trial court's decision. The parties' arguments concerning these other issues are not properly before this Court.

approach was rejected, and the term was held to be subject to judicial refinement. *Parker v Highland Park,* 404 Mich 183; 273 NW2d 413 (1978), *Perry v Kalamazoo State Hospital,* 404 Mich 205; 273 NW2d 421 (1978). See *Cronin v Hazel Park,* 88 Mich App 488; 276 NW2d 922 (1979). *Parker* and *Perry* have been accorded present, rather than prospective effect. *Berkowski v Hall,* 91 Mich App 1; 282 NW2d 813 (1979).

In *Parker,* the analysis of Justices FITZGERALD, KAVANAGH and LEVIN advanced from its prior status as dissent[4] to become the lead opinion of the Court. According to this analysis, the term "governmental function" is limited "to those activities *sui generis* governmental—of essence to governing". *Parker, supra,* 193.[5] These three justices have previously taken this analysis at least one step further, resulting in a distinction between the "planning" aspects of governmental activity, which would be protected from liability, and the "operational" aspects, which would not.[6]

The Court in *Parker* was split, however, and as a result the critical analysis was supplied by Jus-

---

[4] *Pichette v Manistique Public Schools,* 403 Mich 268, 274; 269 NW2d 143 (1978), *Thomas v Dep't of State Highways,* 398 Mich 1, 14; 247 NW2d 530 (1976).

[5] In so doing, the Court rejected the "common good of all" test. *Parker, supra,* 194. See *Martinson v Alpena,* 328 Mich 595; 44 NW2d 148 (1950).

[6] "The parameter of 'governmental function' will most often run along the line of distinction between decisional and planning aspects of government duties on the one hand, and operational aspects on the other. See 3 Davis, Administrative Law Treatise, § 25.10, pp 476-482. In this case, where an operational aspect of the governmental road-building activity is involved, we find no governmental immunity because no exercise or discharge of a governmental function was involved in the act alleged to have been negligently performed, *i.e.,* supervision of a digging operation on a highway construction project." (Footnote omitted.) *Thomas, supra,* 22-23.

This writer has previously expressed general agreement with the planning/operations distinction. *Berger v City of Berkley,* 87 Mich App 361, 373-376; 275 NW2d 2 (1978).

tice MOODY. He accepted the proposition that the Court was free to begin anew in its interpretation of "governmental function", and that immunity should apply only to those activities of government that are of the essence of governing. His analysis amounts to a refinement of that idea, however, and results in a somewhat broader definition of "governmental function":

> "To delineate a complete and balanced definition of governmental function within a simplistic format would be presumptuous. However, as a basic guideline, the crux of the governmental essence test should be founded upon the inquiry whether the purpose, planning and carrying out of the activity, due to its unique character or governmental mandate, can be effectively accomplished only by the government. Unless liability would be an unacceptable interference with government's ability to govern, activities that fall outside this perimeter, although performed by a government agency, are not governmental functions and therefore not immune." *Parker, supra,* 200.

More specifically, it seems apparent that Justice MOODY differs from the FITZGERALD-KAVANAGH-LEVIN analysis in his reluctance to accept a planning/operations distinction as a means of applying the "essence of governing" test.

> "Furthermore, it was observed that the perimeter of governmental function will most often 'run along the line of distinction between decisional and planning aspects of governmental duties on the one hand, and operational aspects on the other'. 398 Mich 21, 22.
> "Although these concepts may have some significance in given cases when applying the 'governmental essence' test, in other instances they could be misleading or inapplicable. For instance, it would be incongruous to find that the operational activities of some public agencies are other than governmental. Likewise, con-

ceivably there could be essential governmental activity which would have some common analogy in the private sector." *Parker, supra,* 200.

Justice Moody's analysis becomes critical at this particular stage in the development of the immunity doctrine because he has emerged as the "swing vote" on questions of the application of governmental immunity. If a given fact situation would satisfy his definition of "governmental function", then it would most likely satisfy Justices Fitzgerald, Kavanagh, and Levin as well. In *Parker,* application of his analysis led him to agree with Justices Fitzgerald, Kavanagh, and Levin that the day-to-day operations of a municipal general hospital were not unique to government nor pursuant to a governmental mandate, and, as a result, were not shielded from liability. In *Perry,* on the other hand, Justice Moody's approach led him to reach the same result as Justices Coleman, Ryan, and Williams, upholding the immunity of a state mental hospital. The different result for public mental hospitals and public general hospitals was based on the state's substantial appropriations for mental health, the legislatively declared policy that services for the seriously mentally handicapped be fostered and provided, and the necessity of public mental facilities for the civil and criminal disposition of the mentally diseased by the courts. Justice Moody noted that private mental health facilities existed, but, since their numbers were inadequate to "deal with the substantial institutional needs of the public", public mental facilities were held to perform "an essentially unique activity mandated by legislative action". *Perry, supra,* 214.

*Parker* and *Perry* have been discussed in only a limited number of cases to date. In *Cronin v Hazel*

*Park, supra,* plaintiff was injured while roller skating during activity conducted by the city's recreation department at a community center building. Plaintiff claimed that the injury resulted from the city's negligent supervision of the event. The Court held that the operation of a roller skating program by a municipal corporation is not a governmental function because it is not "of essence to governing" and, as a result, determined there was no need to ascertain whether the specific activity complained of, *i.e.,* negligent supervision, was an exercise or discharge of that function. Likewise, in *Daugherty v Michigan,* 91 Mich App 658; 283 NW2d 825 (1979), this Court held that the operation of a state recreational area is not of essence to governing, nor, due to its unique character or governmental mandate, can it be effectively accomplished only by government. The plaintiff was allowed to proceed with the action, and governmental immunity was not applied. In *Berkowski v Hall, supra,* this Court held that the operation of an EMS unit by a municipal fire department was not a governmental function. However, in *Central Advertising Co v Novi,* 91 Mich App 303; 283 NW2d 730 (1979), and *Antkiewicz v Motorists Mutual Ins Co,* 91 Mich App 389; 283 NW2d 749 (1979), this Court held respectively that enactment of a regulatory ordinance relating to signs and conducting arson investigations were governmental functions under *Parker* and *Perry* and were entitled to immunity.

In *Lockaby v Wayne County,* 406 Mich 65; 276 NW2d 1 (1979), the Supreme Court once again split on the question of whether governmental immunity was applicable. In *Lockaby,* plaintiff brought an action against several governmental defendants for injuries allegedly suffered while he

was a prisoner in the custody of the Wayne County Sheriff. Summary judgment was granted in favor of all the defendants. The Court agreed that several of plaintiff's claims had to be remanded for trial.[7] However, the dismissal of plaintiff's negligence claim alleging lack of due care in his supervision and in the selection of jail personnel was upheld. Justices MOODY, COLEMAN, RYAN, and WILLIAMS held that the operations of a county jail constituted a governmental function, and that jail personnel, acting within the scope of their duties, were performing public duties and thus were immune.

We are confronted, then, with this lesson from the cases: The operation of a public general hospital, a state recreational area, a municipal roller skating program, and an EMS unit are not governmental functions; the operation of a public mental hospital,[8] a county jail, arson investigations, and the enactment of a regulatory ordinance are. Those cases that have not found a governmental function stress that the activities in question are often carried out by private enterprise as well as government and that the activities are not of such a unique character or governmental mandate that they may be effectively accomplished only by government. Those cases that have found a governmental function involve an activity that can indeed only be carried on by government *(e.g.,* opera-

---

[7] Four of the plaintiff's five claims were reinstated; two on the basis of applicable exceptions to the governmental immunity statute, one on the basis of *Parker, supra,* since it involved the operation of a public general hospital, and one on the basis that it alleged an intentional tort conceivably outside the scope of the exercise or discharge of a governmental function.

[8] See, also, *Jacobs v Dep't of Mental Health,* 88 Mich App 503; 276 NW2d 627 (1979), also involving a state mental facility. *Jacobs* additionally notes that an alleged intentional tort may at times involve the exercise or discharge of a governmental function. See note 7, *supra.*

tion of a jail) or that is necessary to the policies and continued operation of the functions of the state, because of the lack of sufficient similar activity in the private sector (*e.g.*, public mental hospitals).

II

In its essentials, Consumers' tort claim against the District alleges negligence arising out of a failure to notify Consumers that work was being undertaken that could interfere with the power lines, a failure to make arrangements with Consumers to safeguard workers from contact with the lines, a failure to instruct and warn its contractors concerning the lines, a failure to hire a properly licensed and competent contractor, and a failure to adequately supervise and inspect the project in such a manner as to prevent the accident from occurring.

This alleged negligence on the part of the District occurred in the furtherance of the District's undertaking to construct a drain. Applying the rules formulated by our Supreme Court, we hold that the District is not entitled to immunity, and reverse the grant of summary judgment. To begin, the construction of a drain is not of the essence of governing in the way that the operation of a court system, a legislature, or a jail could be said to be. Neither is it an activity that due to its unique character or governmental mandate can be effectively accomplished only by the government. Private persons or organizations could seek to construct drains as well. We are not unmindful of the fact that the Legislature has provided for the establishment and operation of drainage districts, see MCL 280.51 *et seq.;* MSA 11.1051 *et seq.,* nor

are we unaware of the fact that a drainage district might, in general, be able to more easily accomplish the task. The fact remains, however, that the construction of a drain may be effectively accomplished by others than the government. While it is true that in *Perry* the Supreme Court recognized that a mental hospital could also be operated by private individuals, there were several factors present in *Perry* which nevertheless led Justice Moody to accord immunity to state mental hospitals which find no analogy in this case. Specifically, he noted that the number of private mental hospitals was not sufficient to meet the needs of the courts in furtherance of their undeniably governmental function of providing for the proper civil and criminal dispositions of those with serious mental disease. Additionally, he pointed to the substantial state appropriations for mental health in the annual budget and to expressions of legislative policy favoring the care, treatment, and rehabilitation of the seriously mentally handicapped. The construction of a drain is simply not in the same way necessary for the continued functioning of the arms of government as is a mental hospital, nor are we aware of any substantial state appropriations for the construction of drains. The costs of a drain are assessed to those who benefit from it. MCL 280.261 *et seq.;* MSA 11.1261 *et seq.* Neither have we discovered any expression of legislative intent relative to the construction of drains analogous to those relating to the support of services for the mentally ill.

## III

In reaching our decision, we are mindful of the strong policy considerations which call for the limitation of governmental immunity. Certainly

today's social climate has resulted in a relationship between government and the individual where it can no longer be said with conviction that "it is better that an individual should sustain an injury than the public should suffer an inconvenience". *Russell v Men of Devon*, 2 Durnford & East's Term Rep 667, 673; 100 Eng Rep 359, 362 (1788). Rather, we would agree with Professor Borchard, who already long ago said, "justice and a respect for the rights of the individual demand that Government, national, state and municipal * * * adopt necessary legislation to admit the legal responsibility of the State or city for the torts of its officers". Borchard, *Governmental Liability in Tort,* 34 Yale LJ 1, 3 (1924). Professor Cooperrider's understanding of the manner in which the doctrine of governmental immunity first found its way into the law of this state[9] should lead us to recognize that its legitimate application calls for careful analysis, and that such analysis should result in the doctrine being the exception rather than the rule: that we should speak in terms of governmental liability rather than governmental immunity.

This is perhaps easier said than done. Anyone who has witnessed our attempts in this state to formulate a rule for easy application can attest to

[9] "[I]t was imported into the law of Michigan in the first two decades of the twentieth century by a generation of judges and lawyers who found it easier to read about the law in Judge Dillon's treatise on municipal corporations than to track down their own legal heritage." Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan, supra,* 187.

Commentators in general have long suspected that something was wrong with the way in which the immunity doctrine came to be applied. "Just how this feudal and monarchistic doctrine ever got itself into the law of the new and belligerently democratic republic of America is today a bit hard to understand." Prosser, Torts (4th ed), § 131, p 971. "How it came to be applied in the United States of America * * * is one of the mysteries of legal evolution." Borchard, *Governmental Liability in Tort,* 34 Yale LJ 1, 4 (1924).

the frustrations and divisions in opinion that result. The doctrine continues in flux, and we cannot be certain that the analysis we apply today will remain applicable tomorrow. Yet it is significant that a majority of our Supreme Court now recognizes that the proper application of the immunity doctrine requires it to be limited to those activities of essence to government. This is the key to the proper delineation of the scope of the doctrine, and it is supported by both history and constitutional concepts.[10] It is not a tort for government to govern.[11] When those we select to lead us make the hard decisions that we ask them to make on our behalf, it is inevitable that some will feel themselves aggrieved by those decisions. This is the nature of politics, and it is proper that we shield our representatives from tort liability in such

[10] Judge Fox has noted that the abrogation of the broad scope of traditional governmental immunity is consistent with the tenets of common law jurisprudence, where the King was advised that he *must* do no wrong, rather than that he *can* do no wrong. Fox, *The King Must Do No Wrong: A Critique of the Current Status of Sovereign and Official Immunity, supra,* 192-193. Professor Cooperrider has pointed out that in the nineteenth century Michigan Supreme Court the approach was to deny recovery when it was a governmental decision which was complained of, as opposed to the implementation of the decision, which, if wrongful, could form the basis of an action. Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan, supra,* 199-202. See *Henkel v Detroit,* 49 Mich 249; 13 NW 611 (1882).

This distinction between governmental decisions and governmental actions has been thought by some to be of a constitutional dimension, resting on the notion of separation of powers. "What a spectacle it would be if a court in a damage suit were to receive evidence designed to prove that congressmen were at fault in determining which way to vote on a bill!" 3 Davis, Administrative Law Treatise, § 25.11, p 484. See Callahan, *Pittman v City of Taylor: Recent Developments in Governmental Immunity from Tort Liability in Michigan,* 1977 Det Col L Rev 703, 714-716. As discussed more fully in note 12, *infra,* while these ideas may form the basis of an absolute limit to the abrogation of governmental tort immunity, there is good reason to extend the line somewhat ahead of a pure planning/operations distinction.

[11] *Dalehite v United States,* 346 US 15, 57; 73 S Ct 956, 979; 97 L Ed 1427, 1452 (1953) (Jackson, J., dissenting).

cases. Likewise, if our government should cause injury while acting within the scope of operations that we expect of them, and their activity is such that it can only be effectively accomplished by government, we should not hold government responsible for the injury.[12] In today's world, however, government has undertaken many functions that are not necessary to the act of governing and can be effectively accomplished by others. It is in this area that the interests of the individual most clearly outweigh the need to protect government from liability, and accordingly, when its activities fall into this category, we should not hesitate to hold government responsible for its errors.

## IV

The grant of summary judgment in favor of the District is reversed on all counts, and the cause remanded for further proceedings on the merits.

Reversed and remanded.

[12] The most obvious example that comes to mind to illustrate this point is the reasonable restraint of a prisoner in a jail.

"[T]he governmental-function defense negates liability for harms caused by law enforcement and by protective actions of employees such as policemen, firemen, inspectors, and custodial employees, who are by law compelled to act directly upon persons and property, overcoming resistance if necessary. Mistakes are an inevitable consequence of such activity, and it may be that resultant losses should, to some extent, be absorbed by the community, but the problems of separating instances where compensation would be appropriate from those in which it would not is complex, and it is difficult to see how, with any fidelity to language, it could be held that these employments are anything but governmental." Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan, supra,* 283. See *Jacobs v Dep't of Mental Health, supra,* 506. But see *Antkiewicz v Motorists Mutual Ins Co, supra,* 395-396.

Recognition of this point leads to the conclusion that while the proper scope of governmental tort immunity may often follow a line of distinction between planning and operations, this is not always the case. *Parker v Highland Park, supra,* 200 (MOODY, J., concurring). See Fox, *The King Must Do No Wrong: A Critique of the Current Status of Sovereign and Official Immunity, supra,* 196-197.