## ROSS v CONSUMERS POWER COMPANY

Docket No. 64241. Argued December 9, 1980 (Calendar No. 1).—Decided December 8, 1982. Rehearing granted 417 Mich 1113.

Michael Ross and Ruth Ross, his mother, brought an action against Consumers Power Company in the Jackson Circuit Court for damages for injuries suffered by Michael Ross in the course of his employment in the construction of a drain to be incorporated into the John Saines Project 1 Drainage District when construction machinery near him came into contact with a Consumers' electric line, causing him severe electrical burns. Consumers brought a third-party action against the drainage district and Wendell A. Gee, the Jackson County Drain Commissioner, alleging negligence in failing to notify it of the impending construction and in failing to make arrangements to safeguard the construction workers. The circuit court, Charles J. Falahee, J., granted the third-party defendants' motions for summary judgment on the ground of governmental immunity. Consumers appealed, and the Court of Appeals, V. J. Brennan, P.J., and Bronson and Cynar, JJ., reversed and remanded the case to the circuit court, holding that upon application of the "essence of governing" test the drainage district was not immune from tort liability (Docket No. 78-2140). The drainage district appeals.

The judgment of the Court of Appeals was affirmed by an equally divided Court.

Justice Ryan, joined by Justices Williams and Coleman, would hold that the drainage district is immune from tort liability for Michael Ross's injuries. The Court of Appeals erred, not in applying the "essence of governing" test to deter-

REFERENCES FOR POINTS IN HEADNOTES

[1] 72 Am Jur 2d, States, Territories, and Dependencies § 99.

[2, 4] 57 Am Jur 2d, Municipal, School, and State Tort Liability § 191.
Municipality's liability arising from negligence or other wrongful act in carrying out construction or repair of sewers and drains. 61 ALR2d 874.

[3] 57 Am Jur 2d, Municipal, School, and State Tort Liability §§ 28, 29.
Municipal immunity from liability for torts. 60 ALR2d 1198.

mine the drainage district's status, but in the manner in which it applied it and therefore in the result reached.

1. The governmental immunity statute provides that all governmental agencies are immune from tort liability where engaged in the exercise or discharge of a governmental function. Three tests have emerged from case law for determining whether a particular activity is a governmental function within the meaning of the statute. The "common good of all" test is generally understood to refer to an activity by an agency which is statutorily immune from tort liability because it was immune at common law. The "essence of governing" tests involve the use of the same shorthand expression to convey different meanings. One test would determine an agency activity to be an exercise of a governmental function only where it is uniquely associated with activities having no common analogy in the private sector, an activity *sui generis* governmental. The other test is founded upon the inquiry whether the purpose, planning, and carrying out of the activity, due to its unique character or governmental mandate, can be accomplished effectively only by the government. Unless liability would be an unacceptable interference with the government's ability to govern, activities which fall outside the definition, although performed by a government agency, are not governmental functions and are not immune. None of the tests enjoys acceptance by a clear majority of the members of the Supreme Court.

2. The Court of Appeals erred, not in choosing to apply an "essence of governing" test, but in the manner in which the test was applied and in the consequent result. The Court of Appeals concluded that because the construction of a drain may be effectively accomplished by others than the government, the activity is not a governmental function. But to apply the test chosen by the Court of Appeals properly, the focus of the determination cannot simply be upon the construction phase of the drain. Rather, it must embrace the entire activity —the creation of a public drain from conception to completion, including all of the necessary intermediate steps, particularly where, as in this case, the size, location, and direction of the water flow is part of an interdependent network of drains throughout the state, having common purposes, and built under the coordinating mandate of a state statute.

3. The "common good of all" standard, rather than either of the "essence of governing" tests, correctly measures whether a particular activity is a governmental function. At common law,

the expression "governmental function" described the nature and defined the limits of state and municipal immunity from tort liability. By employing the term in the governmental immunity statute, the Legislature appears to have directed the courts to look to the common law for guidance in determining whether an activity of an agency is a governmental function. Prior to the enactment of the statute, governmental function was defined in terms of an activity's accomplishment for the "common good of all". The underlying test for liability was whether the activity was performed for the common good of all without the element of special corporate benefit or pecuniary profit. If it was, there was no liability. That the activity could be undertaken voluntarily and not under compulsion of a statute was of no consequence.

4. No Michigan case directly addressed whether a drainage district is immune from liability for tortious acts committed in the course of drain construction. Analysis of the nature of the activity, however, reveals that it was for the common good of all. The drain was being constructed under the authority of a governmental agency. It was authorized, conceived, designed, financed, and constructed, and is currently maintained, under authority of the Drain Code. The purpose of the drain is to serve a general public interest rather than an essentially private interest.

5. If the "essence of governing" test is applied correctly, the activity is again seen to be a governmental function, and, following that definition, it necessarily is a function conducted "for the common good of all". In addition, the size of the fiscal commitment necessary to sustain the statewide system of drains is such that when considered with the totality of the factors involved, the unique character and governmental mandate of the activity enable it to be effectively accomplished only by the government.

Justice Kavanagh, joined by Chief Justice Fitzgerald and Justice Levin, would hold that while providing a comprehensive system of drains by a drainage district contributes to the common good, the fact that the district engages in the activity does not convert it into a function of government so as to render the district immune from tort liability, and would affirm the judgment of the Court of Appeals.

93 Mich App 687; 287 NW2d 319 (1979) affirmed by an equally divided Court.

Opinion by Ryan, J.

1. Governmental Immunity — Governmental Function — "Common Good of All".

*A governmental agency, to be immune from liability for tortious acts, must be engaged in the exercise or discharge of an activity which is performed for the common good of all without an element of special corporate benefit or pecuniary profit; that the activity could be undertaken voluntarily and not under compulsion of a statute is of no consequence (MCL 691.1407; MSA 3.996[107]).*

2. Governmental Immunity — Drains — Governmental Function.

*The construction by a governmental agency of a drain which is part of a statewide system of drains authorized by the Drain Code to assure the preservation of the public health, convenience, and welfare is an activity performed for the common good of all; as such, it is a governmental function, rendering the agency immune from liability for tortious acts committed in the construction (MCL 280.1 et seq., 691.1407; MSA 11.1001 et seq., 3.996[107]).*

3. Governmental Immunity — Common Law — Governmental Function — "Common Good of All".

*The Legislature, in employing the term "governmental function" in enacting the governmental immunity statute, appears to have directed the courts to look to the common law for guidance in determining whether an activity of a governmental agency is a governmental function because the term was a term of art at common law to describe the nature and define the limits of state and municipal immunity from tort liability; under case law before the enactment of the statute, a governmental function was an activity performed for the common good of all (MCL 691.1407; MSA 3.996[107]).*

Opinion by Kavanagh, J.

4. Governmental Immunity — Drains — Governmental Function.

*Providing a comprehensive system of drains by a drainage district is not a function of government which renders the district immune from tort liability (MCL 691.1407; MSA 3.996[107]).*

*W. E. Wisner* for defendant, third-party plaintiff Consumers Power Company.

*Parker, Adams & Mazur, P.C.* (by *James D.*

*Adams),* for defendant John Saines Project 1 Drainage District.

Amici Curiae:

*Robert H. Fredericks, II,* for Oakland County Drain Commissioner, George W. Kuhn, and the Michigan Association of County Drain Commissioners.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *Richard J. McClear* and *Joseph F. Lucas)* and *George W. Crockett, Jr.,* Acting Corporation Counsel, and *Darryl F. Alexander,* Assistant Corporation Counsel, of counsel, for the City of Detroit.

*Bauckham, Reed, Lang, Schaefer & Travis, P.C.* (by *John H. Bauckham* and *Robert F. Travis),* for Michigan Townships Association.

RYAN, J. This is a governmental immunity case. There are two issues to be decided:

(1) Whether the John Saines Project 1 Drainage District is immune from tort liability for certain alleged derelictions which, it is claimed, resulted in serious injury to plaintiff Michael Ross, and
(2) Whether the Court of Appeals erred in applying the "essence of governing" test in determining that the appellant drainage district did not enjoy governmental immunity.[1]

We answer the questions yes and no respectively.

___

[1] In the order granting leave to appeal, we specifically directed the parties "to include among the issues to be briefed: whether the Court of Appeals erred by applying the 'essence of governing' test in determining that the third-party defendant drainage district's activity in the instant case did not enjoy governmental immunity". 408 Mich 959.

Resolution of both questions turns ultimately upon an interpretation of MCL 691.1407; MSA 3.996(107), the governmental immunity statute, which provides:

"Except as in this act otherwise provided, all governmental agencies shall be immune from tort liability in all cases wherein the government agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided herein, this act shall not be construed as modifying or restricting the immunity of the state from tort liability as it existed heretofore, which immunity is affirmed."

I

For purposes of this litigation, the principal operative words in the statute, of course, are "governmental function". What did the Legislature intend the expression "governmental function" to mean when it conferred immunity from tort liability upon "all governmental agencies" for injury resulting from the agencies' engagement in "the exercise or discharge" of such functions? The answer to that question has divided this Court for six years. Three tests have emerged from our decisions for determining whether a particular activity is a governmental function within the meaning of the statute.

The first of the tests has come to be known as "the common good of all" test, and both of the other two, for reasons explained below, have come to be known as the "essence of governing" tests. Neither expression is found in the governmental immunity statute. They are the result of judicial efforts to distill from the Legislature's somewhat cryptic statutory language an understandable and

easily applied standard for identifying activities undertaken by agencies of government which the Legislature intends to be immune from tort liability.

## A

The expression "common good of all" has been used for more than a half century in cases discussing the doctrine of governmental immunity. Originally, it was intended to distinguish between governmental activity which has an exclusively public purpose as opposed to that which is "of special corporate benefit or pecuniary profit". See *Bolster v City of Lawrence,* 225 Mass 387; 114 NE 722 (1917). The expression was first employed in our state's jurisprudence in cases concerning the immunity or liability of municipal corporations to distinguish between "governmental" and "proprietary" municipal functions. *Gunther v Cheboygan County Road Comm'rs,* 225 Mich 619, 621; 196 NW 386 (1923). See also *Martinson v Alpena,* 328 Mich 595; 44 NW2d 148 (1950), and cases cited therein. More recently the expression has been used in governmental immunity cases interpreting MCL 691.1407; MSA 3.996(107) to describe the standard by which an activity of a governmental agency is judged to be a governmental function and therefore immune from tort liability at the common law. For example, in *Perry v Kalamazoo State Hospital,* 404 Mich 205, 211-212; 273 NW2d 421 (1978), discussing the immunity or liability of a public hospital, the lead opinion stated:

"Furthermore, the operation of a public hospital comes clearly within the frequently cited 'common good of all' definition of governmental function.³"

---

³ '"The underlying test is whether the act is for the common good of all without the element of special corporate benefit or pecuniary

profit. If it is, there is no liability; if it is not, there may be liability. That it may be undertaken voluntarily and not under compulsion of statute is not of consequence." ' *Gunther v Cheboygan County Road Comm'rs,* 225 Mich 619, 621; 196 NW 386 (1923), citing *Bolster v City of Lawrence,* 225 Mass 387; 114 NE 722 (1917)."

If the briefs of the parties and amici curiae in this case are any indication, the expression "common good of all test" is now generally understood by the profession to describe the standard adopted by presently seated Justices COLEMAN, WILLIAMS, and RYAN to describe an activity which is statutorily immune from tort liability because it was immune from such liability at the common law.

### B

The idiom "essence of governing test" has emerged from our decisions as a shorthand expression to describe another standard to determine whether a specific activity being performed by an agency of government, or at its direction, is the kind of "governmental function" over which the Legislature has conferred the protection of immunity from tort liability. There is a potential for confusion in the use of that expression because, while the expression is used by Chief Justice FITZGERALD and Justices KAVANAGH and LEVIN to define an immune governmental function, it means something different to them than it did to the late Justice MOODY.

The original version of the expression first appeared in our reports in the dissenting opinion of Justices KAVANAGH and FITZGERALD, also signed by Justice LEVIN, in *Thomas v State Highway Dep't,* 398 Mich 1, 21; 247 NW2d 530 (1976). After first declaring:

"We conclude that a function is not 'governmental' in this context unless the particular activity that this function entails is uniquely associated with the activities having 'no common analogy in the private sector' ",

the dissenters observed:

"Thus, 'governmental function' is not delineated by questions of the broad scope of an activity undertaken or by financial or insurance considerations which may be indicative of a governmental undertaking, but rather by viewing the precise action allegedly giving rise to liability, and determining whether such action is *sui generis* governmental—*of essence to governing.*" (Emphasis added.)[2]

The expression next appeared in Justice FITZGERALD's opinion in *Parker v Highland Park,* 404 Mich 183, 193; 273 NW2d 413 (1978), again signed only by himself, Justice KAVANAGH, and Justice LEVIN. There it was stated:

"We would limit the term 'governmental function' to those activities *sui generis* governmental—of essence to governing."

And:

"In adopting the 'of essence to government' *[sic]* test for defining the term 'governmental function', we reject the 'common good of all' test applied in *Martinson v Alpena* [328 Mich 595; 44 NW2d 148 (1950)]."

Since the decision in *Thomas,* Justice LINDEMER,

[2] The opinion by Justice WILLIAMS for a controlling majority of four Justices in *Thomas* made no mention of the expression "of essence to governing", or "essence of governing" and held "that the Legislature, in choosing the precise terminology of 'governmental function' to describe the limits of governmental immunity, intended that activities described as governmental functions at common law at the time of enactment of the new legislation would enjoy *statutory* immunity from tort liability". 398 Mich 10.

who subscribed to the "common good of all" test and voted with the majority in that case, departed the Court and was succeeded by the late Justice MOODY. Being unpersuaded by the rationale of the FITZGERALD-KAVANAGH-LEVIN opinion in *Parker* limiting governmental immunity to activities that have "no common analogy in the private sector", and equally unpersuaded by the reasoning and result of the RYAN opinion, also signed by Justice COLEMAN and Justice WILLIAMS, for reaffirmation of the common-law "common good of all" definition of governmental immunity, Justice MOODY wrote separately, stating:

"To delineate a complete and balanced definition of governmental function within a simplistic format would be presumptuous. However, as a basic guideline, the crux of the governmental essence test should be founded upon the inquiry whether the purpose, planning and carrying out of the activity, due to its unique character or governmental mandate, can be effectively accomplished only by the government. Unless liability would be an unacceptable interference with government's ability to govern, activities that fall outside this perimeter, although performed by a government agency, are not governmental functions and therefore not immune." *Parker, supra,* 404 Mich 200.

Having thus narrowed, at least for himself, the "of essence to governing" or "essence to government" or "governmental essence", or "essence of governing" test, Justice MOODY established still a third view of the meaning of "governmental function" and a second meaning of the "essence of governing" test.

That three-three-one division of this Court as to the meaning of the legislative expression "governmental function" recurred in *Perry v Kalamazoo State Hospital, supra,* which was released with the

*Parker* case. The result in that case was a finding of immunity because Justice MOODY, although applying his new definition of "essence of governing", found on the facts of the case that the defendant hospital was engaged in a governmental function and thus was immune from tort liability.

In the wake of our multihued definition of "governmental function" in *Thomas, Parker,* and *Perry,* the "essence of governing" expression has virtually taken on a life of its own. The Court of Appeals has employed the expression in at least 29 published opinions as the last pronouncement of a majority of this Court as to what is meant by the legislative term "governmental function". Until such time as a majority of this Court can agree upon a single meaning for the "essence to governing" or "essence of governing" expression, it will have no usefulness in defining the term "governmental function" as used in the statute and will continue to contribute to the confusion and obfuscation which for six years now have attended the law of governmental immunity in this state.

C

This case has been under consideration for some time. All of the members of the Court have attempted to identify a single, workable rule for reasonably easy application which would enable litigants, advocates, judges, students, insurers, legislators, and taxpayers, and all we serve, to predict with reasonable accuracy which governmental activities are immune from tort liability and which are not. Despite special attention during opinion conference to that goal and the best good-faith effort of each member of the Court, it has not been possible to develop majority adherence to such a rule.

It must be left to another day and to either a newly constituted Court or a change of mind among presently seated members, in just the right combination, to enable us to enunciate the definitive rule which we all would welcome.[3]

In the wake of our inability to announce a definitive test for determining whether a specific governmental activity is a governmental function, immune from tort liability, a number of Court of Appeals panels have struggled to formulate a precedentially binding test. Inevitably, of course, there has been disagreement in that Court just as in our own, and no single test has emerged. As an innovative and logical alternative, several panels of the Court of Appeals have treated Justice MOODY's version of the "essence of governing" test as though it were the rule, not because any other member of this Court has subscribed to it—none has—but because, as a practical matter, on the facts of a particular case, Justice MOODY, employing his own test, was probably the tie-breaker for determining whether an activity is a "governmental function". That is what occurred in the decisions of *Perry* and *Parker, supra.* In this litigation, therefore, after reviewing the differences between the FITZGERALD-KAVANAGH-LEVIN version of the "essence of governing" test, and Justice MOODY's version, the Court of Appeals panel below stated:

"Justice MOODY's analysis becomes critical at this particular stage in the development of the immunity doctrine because he has emerged as the 'swing vote' on

[3] Within a few weeks of the release of this opinion, because of the resignation of one of our members, the retirement of another and the death of Justice MOODY, and the combined effect of the elective and appointive processes, there will be a newly constituted Supreme Court. Perhaps a majority can then be mustered for a single rule of law which will bring definition and clarity and binding precedent to this important area of our state's jurisprudence.

questions of the application of governmental immunity. If a given fact situation would satisfy his definition of 'governmental function', then it would most likely satisfy Justices FITZGERALD, KAVANAGH, and LEVIN as well. In *Parker,* application of his analysis led him to agree with Justices FITZGERALD, KAVANAGH, and LEVIN that the day-to-day operations of a municipal general hospital were not unique to government nor pursuant to a governmental mandate, and as a result, not shielded from liability. In *Perry,* on the other hand, Justice MOODY's approach led him to reach the same result as Justices COLEMAN, RYAN, and WILLIAMS, upholding the immunity of a state mental hospital." 93 Mich App 694.

And:

"Anyone who has witnessed our attempts in this state to formulate a rule for easy application can attest to the frustrations and divisions in opinion that result. The doctrine continues in flux, and we cannot be certain that the analysis we apply today will remain applicable tomorrow. Yet it is significant that a majority of our Supreme Court now recognizes that the proper application of the immunity doctrine requires it to be limited to those activities of essence to government." 93 Mich App 699-700.

It is evident, therefore, that in terms of attempting to assemble from our fragmented plurality a workable rule of law for decision in this case and guidance to the bar and trial judiciary, it cannot be said in the technical sense that the Court of Appeals "erred in applying the 'essence of governing' test" since it was an idiom adopted by a majority of four members of this Court, albeit for different reasons. We would hold that it erred, however, not in the test applied, but in the *manner* in which the test was applied and consequently in the result reached.

## II

We are compelled to express first of all our fundamental disagreement with either version of the "essence of governing" test, and we reassert our conviction that the "common good of all" standard correctly measures whether a particular activity is a governmental function. Moreover, even assuming for the sake of argument that the Court of Appeals did not err in selecting Justice MOODY's "essence of governing" test from the choices available, we are of the view that the panel misapplied the test with the result that it erred in concluding that the activity in which the drainage district was engaged when Ross was injured was not a "governmental function".

. Our view of the correct test for determining the question before us was announced in *Perry* and *Parker*. It is, to reiterate, that:

"At common law, the expression 'governmental function' was the term of art which both described the nature and defined the limits of state and municipal immunity from tort liability. By employing that same term of art in creating statutory immunity, the Legislature appears to have directed the courts to look to the common law for guidance in determining whether, in a given case, a governmental agency is exercising or discharging a 'governmental function' ". 404 Mich 203.

And:

"A review of the case law of governmental immunity that existed prior to the legislative affirmation of the state's immunity provides guidance to this Court in two respects. First, the factual questions resolved in those decisions provide concrete examples of the specific activities contemplated by the Legislature when employing

the term 'governmental function'. Second, that case law provides a definition of the term 'governmental function'." (Footnote omitted.) 404 Mich 211.

And:

"Furthermore, the operation of a public hospital comes clearly within the frequently cited 'common good of all' definition of governmental function.[3]"

---

"[3] ' "The underlying test is whether the act is for the common good of all without the element of special corporate benefit or pecuniary profit. If it is, there is no liability; if it is not, there may be liability. That it may be undertaken voluntarily and not under compulsion of statute is not of consequence." ' *Gunther v Cheboygan County Road Comm'rs,* 225 Mich 619, 621; 196 NW 386 (1923), citing *Bolster v City of Lawrence,* 225 Mass 387; 114 NE 722 (1917)." 404 Mich 211-212.

---

We turn then to ascertain whether, at the common law, the construction of a drain by a governmental agency[4] was a "governmental function" immune from tort liability in the sense that it was an activity for the "common good of all".

## A

There is no Michigan case which deals directly with the immunity or liability of a drainage district for tortious acts committed in the process of drain construction. There is early, indeed ancient, Michigan authority standing for the proposition that a municipality did not enjoy immunity from liability for injuries suffered when a citizen fell into an unprotected sewer under construction. *Detroit v Corey,* 9 Mich 165, 184 (1861). The essence of the Court's reasoning was that the power granted to the city to build sewers

---

[4] Consumers Power granted an easement to Jackson County for the purpose of construction of the drain. It is not disputed that appellant drainage district is a "governmental agency" within the meaning of MCL 691.1407; MSA 3.996(107).

"was not a power given to the city for governmental purposes, or a public municipal duty imposed on the city, as to keep its streets in repair, or the like, but a special legislative grant to the city for private purposes. The sewers of the city, like its works for supplying the city with water, are the private property of the city—they belong to the city. The corporation and its corporators, the citizens, are alone interested in them—the outside public or people of the state at large have no interest in them, as they have in the streets of the city, which are public highways."

With similar reasoning, the Court in *Ostrander v Lansing,* 111 Mich 693; 70 NW 332 (1897), held the City of Lansing liable to one of its workers for injuries resulting from a cave-in during the excavation phase of the construction of a sewer. The *Ostrander* Court rejected the contention that "the construction of the sewer was the exercise of a governmental function" and cited the above-quoted language from *Corey* for the proposition that the sewer construction was "a private municipal enterprise".

*Corey* and *Ostrander,* and cases like them, seem, therefore, at first glance to stand as precedent for the proposition that construction of a sewer, and by analogy a drain, is not a governmental function as that expression has been employed historically in the law of governmental immunity. However, closer examination of those cases and of the fitful and arcane development of the law of governmental immunity, particularly municipal immunity, reveals that no such conclusion may properly be drawn. *Corey* and *Ostrander* are products of a time when the immunity of municipalities for misfeasance was in certain respects the exception rather than the rule. At the time, there was the widely held notion

"that the special grant of governmental powers to a municipal corporation, normally made at the request of the incorporators, constituted consideration for an implied obligation on the corporation's part to perform its duties in a proper way and that this implied obligation was for the benefit of individuals injured by [misfeasance], as well as for the benefit of the public at large." Cooperrider, *The Court, the Legislature, and Governmental Tort Liability in Michigan,* 72 Mich L Rev 187, 197 (1973).

Thus, the liability of municipalities turned in part on whether the activity in question was for the benefit of only the local community (liability) or was instead for the benefit of the state (immunity). There came to be a

"distinction between functions performed by local officials as agents of state policy and functions that relate instead to the 'private' or parochial concerns of the local community." Cooperrider, *supra,* 213.

The terms "governmental" and "public" came to be associated with activities that were seen as being the business of the state, which were conducted, by definition, for the benefit of the people of the state at large. These activities were contrasted to "private" or "corporate" activities, which benefitted only the residents of the municipality (the corporation). The distinction was based on the identity of the governmental entity to which a particular activity was thought to be properly entrusted rather than the nature of the activity itself, which is the consideration at the core of what came to be the distinction between governmental and proprietary functions.

Accordingly, *Corey* and *Ostrander* can be distinguished on the ground that the defendants in those cases were municipalities and the cases were

decided on that basis. MCL 691.1407; MSA 3.996(107) was meant to bring into uniformity the liability of all governmental entities; the criterion has become the nature of the activity in question rather than the identity of the governmental entity entrusted with carrying out that activity.

We are left, therefore, without any applicable Michigan case precedent directly determining whether construction of a storm sewer is an activity for the "common good of all", and therefore a governmental function for the performance of which a governmental agency is immune from tort liability at common law.

Reference to cases in foreign jurisdictions is equally unhelpful. There is notable inconsistency both in the manner in which the question before us has been treated in other states and the rules of law governing decisions elsewhere. For every case that can be found in a sister jurisdiction for the conclusion that a municipal or quasi-municipal government is immune from liability for damages caused by negligence in sewer or drain construction, another case can be found reaching the contrary result. Sometimes decisions are reached on consideration of the doctrine of governmental immunity and sometimes not. Often, the complicating aspect of the law of nuisance is introduced into the decisions of other states. It suffices to say that there is no discernible predominating thread of foreign authority construing a governmental immunity statute comparable to Michigan's to provide meaningful guidance in the resolution of the question before us.[5]

---

[5] Apparently recognizing the uniquely Michigan character of the statute we construe, neither of the parties, nor the amici curiae, have cited any cases from foreign jurisdictions as guidance for the question at hand.

## B

We undertake then to analyze the nature of the activity involved in this case to determine whether it is for the "common good of all".

Because this case is before us on an appeal from a reversal of a summary judgment, there is no factual record from which we can learn the details of the size, location, and immediate necessity of the drain in question, the topography of the area in which it has been built, or the manner in which it complements other sewage and drainage facilities in Jackson County. It is clear, however, that the drain was being constructed under the authority of a governmental entity, the John Saines Project 1 Drainage District, and under the direction of the drain commissioner, Wendell Gee. As such, it was a public project authorized, conceived, designed, financed, and constructed, and now maintained, by authority of legislative enactment, the Drain Code of 1956, MCL 280.1; MSA 11.1001, of which more will be said below. We can and do take judicial notice that the purpose of such a drain is necessarily public in the sense that it is intended to serve the general public interest as distinguished from an essentially private interest.

The Legislature has explicitly declared that drains are to be "located, established, constructed and maintained" by "a county drain commissioner", as was the case here, "whenever the same shall be conducive to the public health, convenience and welfare". MCL 280.2; MSA 11.1002. Plainly, that is a mandate intended to serve the common good of all.

The drain in question was planned, designed, and constructed, and is maintained, not as a benefit to a single private landowner or group of landowners, but as part of a comprehensive state-

wide system of water management control mandated by the Legislature in the Drain Code. While that legislation authorizes the establishment of local drainage districts for the planning, funding, and construction of such drains, the entire process is tightly controlled and circumscribed by the highly detailed and pervasive Drain Code having statewide application. As is evident from an examination of the lengthy and detailed statute, the purpose of each public drain, among the thousands of such drains in the state, is to collect and move storm and waste water in a certain direction, at an appropriate rate, through facilities designed and engineered to guard against disease, flooding, and property damage. The drain here in question is such a drain and was built therefore for the protection of all the citizens and the benefit of all the property in the State of Michigan. For these reasons, together with those discussed more fully in Part IIC, we think it is plain that such a purpose is "for the common good of all".

## C

Even if we were not convinced of the correctness of the "common good of all" test, but subscribed instead to our late brother MOODY's version of the "essence of governing" test for identifying a governmental function, we would reach the same result in this case, a result contrary to that reached by the Court of Appeals. Moreover, if the activity involved in this case is a "governmental function" according to Justice MOODY's definition, it necessarily is one conducted "for the common good of all".

As indicated in his separate opinion in *Parker, supra,* p 200, our brother described the test to

which he subscribed, and we repeat it here for ease of reference:

"To delineate a complete and balanced definition of governmental function within a simplistic format would be presumptuous. However, as a basic guideline, *the crux of the governmental essence test should be founded upon the inquiry whether the purpose, planning and carrying out of the activity, due to its unique character or governmental mandate, can be effectively accomplished only by the government.* Unless liability would be an unacceptable interference with government's ability to govern, activities that fall outside this perimeter, although performed · by a government agency, are not governmental functions and therefore not immune." (MOODY, J., *concurring*). (Emphasis added.)

Accepting, for the sake of discussion, that our late colleague's test is the correct standard for determining whether the activity in question in this case was a governmental function, we think it is evident that it was, and that the drainage district is therefore clothed with immunity from tort liability for the injuries suffered by the plaintiff Michael Ross.

Analyzed under Justice MOODY's criteria, the question before us becomes whether the laying out, designing, financing, construction, and maintenance of a public drain is an "activity", the "purpose, planning and carrying out" of which, "due to its unique character or governmental mandate", can be effectively accomplished only by the government.

The Court of Appeals answered that question in the negative because it determined that "the *construction* of a drain may be effectively accomplished by others than the government". 93 Mich App 698. We think, however, that it will not do

simply to focus, as the Court of Appeals did, upon the "construction" of a drain and conclude that such an activity is not governmental because it can be effectively accomplished by persons in the private sector. Of course that is so, if "construction" is narrowly defined as only the actual labor involved in the excavation, grading, laying of the drain tile or pipe, masonry work, backfilling of the drain site, removal of construction equipment, and the workers' departure from the project. Certainly all "construction" of any public project "may be effectively accomplished by others than the government", and it usually is. The construction work on virtually all governmental projects, including buildings, bridges, sewers, highways, reservoirs, and other public projects is usually performed by private contractors to whom a construction contract has been awarded on a bid. Indeed, that was the case here. Michael Ross's employer, Dunigan Brothers, Inc., was hired by the drainage district to build the drain. The "activity" which the governmental agency was engaged in here was the creation of the John Saines Drain. It was a process which began with an idea and ultimately ended with departure from the construction site of the men and machines used in the construction phase of the drain building project. The countless intermediate steps, however, included planning, conferences, bid letting, engineering surveys, financing arrangements, preparation of drawings, public meetings, land surveys, soil borings, site preparation, and a host of other mental, physical, and mechanical functions culminating in the first flow of water through the new drain. To properly apply the test announced by Justice MOODY and purportedly applied by the Court of Appeals below, one does not focus merely upon the labor involved in the construction phase of the project in order to

answer the question whether the purpose, planning, and carrying out of the "activity", due to its unique character or governmental mandate, can be effectively accomplished only by the government. The proper focus is much broader and should embrace the entire "activity": creation of a public drain from conception to completion, including all of the necessary intermediate steps. That is particularly true in this case where the size, location, and direction of the water flow of the drain is part of an interdependent network of drains throughout the state, having common purposes, and built under the coordinating mandate of a state statute.

We turn to consider whether the activity in question, more particularly its purpose, planning, and execution, due to its uniqueness or to governmental mandate, "can be effectively accomplished only by the government".

Certainly it is obvious that the planning, engineering, construction, and maintenance of a single and isolated storm or waste water drain is not an activity which can be effectively carried on only by the government. Undoubtedly, there are many storm drains in the state which were privately financed and built, and were designed primarily to serve the convenience of the property owners who built them. That is particularly so in the less populous rural areas of this state. There is nothing about drain construction per se which is indigenous to government or implicates uniquely governmental interests.

In reality, however, the thousands of public drains situated throughout the state must, in the totality, serve a common purpose: to provide for the healthful, efficient, safe, and systematic drainage and flow of storm and waste water in a man-

ner conducive to the health and welfare of the people of the State of Michigan. If each landowner were left to provide or to refuse to provide drainage of surface and waste water in a fashion and in a direction which he saw fit, the risk of disease and the threat of serious property damage, environmental contamination, and danger to natural resources would be imminent, evident, and unacceptably high.

As early as 1915 this Court stated in *Cilley v Sullivan*, 187 Mich 447, 453; 153 NW 773 (1915):

"As the state has become more populous, and with the progress of scientific thought and investigation, the question of the public health has become more and more recognized as a question of vital interest to the State at large, and it needs no argument to demonstrate that proper drainage is one of the very essential prerequisites to the creation of proper sanitary and healthful conditions."

More recently, the people of this state, in Const 1963, art 4, § 52, declared:

"The conservation and development of the natural resources of the state are hereby declared to be of paramount public concern in the interest of the health, safety and general welfare of the people. The legislature shall provide for the protection of the air, water and other natural resources of the state from pollution, impairment and destruction."

As noted by the Oakland County Drain Commissioner in his brief amicus curiae:

"The practical purpose for the construction of any county drain is to conserve and protect the natural resources of the state. Without the protection afforded by modern storm drainage facilities, large areas of the state would be exposed to severe pollution, impairment

and destruction from storms and natural drainage flows which cannot be accommodated by existing natural drainage patterns."

The interdependence of the state's network of storm drains and waste water control systems is an important indication of the fact that the design, layout, construction, and maintenance of such a system is a function uniquely appropriate to government and is most effectively carried on by it. While it is conceivable that a person or a community might choose to live without electric power or natural gas, such a decision need have little, if any, impact upon neighboring communities. However, the failure of a private landowner, or an entire community, to collect, divert, and dispose of storm and waste water through a public drain system, carefully coordinated statewide to guard against health hazards and property damage, could have a disastrous effect upon neighboring communities which make use of common lakes, streams, and ground water. Thus, although it is obvious that there may be many instances in the state of privately planned, financed, and constructed drains, the fact remains that on a statewide basis the functions which the drains are designed to accomplish could not be assured without the coordinating and coercive power of government. In a state of nine million people, it would be impossible, for example, to assure the existence of a surface water control system adequate to meet the health and safety needs of the people and the integrity of the environment without compulsory public financing of drain construction.

What is written here about the governmental character of the activity involved in this case must be understood to apply with equal force to the construction of a small storm water drain in a

remote rural area of our state and to the complex and massive water and pollution control system for the highly populous urban areas of our state.

We agree with the observation made by amicus curiae City of Detroit that:

"In the case of the construction and operation of modern water and/or sewage systems, government's role is pervasive. The vast majority of water and sewage systems in Michigan are constructed, owned and operated by government. This observation is underscored when urban areas are considered, for all such areas are serviced by large, sophisticated and integrated water and sewage systems, constructed, owned and operated by government. The haphazard and sporadic efforts of privately owned companies could not begin to satisfy the public's demand for water and sewage systems in these areas.

"Such activity, moreover, furthers an express public policy since it is essential to the protection of the public health, and * * * is mandated by federal and state statutes. The construction and operation of modern sewage and water systems is supported by substantial annual appropriations of tax revenues. Finally, the magnitude and complexity of the modern water and/or sewage system gives it a unique character and furthers an express governmental mandate, such that it can only be 'effectively' accomplished by government."

A further indication that the purpose, planning, and carrying out of an interdependent statewide storm water drain construction and maintenance system "can be effectively accomplished only by government" is the size of the fiscal commitment necessary to sustain such a system.

Amicus curiae City of Detroit represents to this Court that in 1980 the total cost of the capital improvement program for the six-county southeastern Michigan regional pollution abatement system was 252 million dollars; of that amount

184.8 million dollars was provided by federal and state governments. In that same year, the total operation and maintenance cost for the Detroit waste water treatment system, adjusted for inflation, was in excess of 75 million dollars, a substantial portion of which was paid by federal and state government. While the Detroit water pollution abatement system involves a massive and complex system for sewage disposal, and the John Saines Drain apparently does not, the point remains, nevertheless, that in the densely populated urban areas of the state, storm and waste water collection, drainage, and purification must be a coordinated and integral part of a massive multimillion dollar overall system for water management in order to guard against disease, property damage, and environmental contamination.

A comprehensive statewide system of drains which can collect and move storm and waste water in the direction and at a rate which will protect the people of the state from the risk of disease, flooding, and damage to public and private property, and which will preserve and enhance the environment and tend to preserve natural resources, is a function uniquely appropriate to a coordinating state government, specifically charged constitutionally with protecting the health and welfare of all citizens. Furthermore, they are functions specifically mandated by the Legislature in the Drain Code, pursuant to which the drain was built.

Upon examination of the Drain Code, one is immediately struck by the pervasiveness of the role of the state and local government in the planning, constructing, financing, maintenance, and operation of a drainage system for the state. The code is a comprehensive law providing for

county drainage districts, prescribing the duties of
county drain commissioners, and providing for the
establishment, construction, and maintenance of
drains, the levying and collection of drain taxes,
and related matters. The lengthy and highly de-
tailed provisions of the statutory scheme suggest
the importance to the public health and welfare of
the proper drainage of public and private lands.
The sweep of the statute can be appreciated at a
glance by reference to the preamble of the law
which states its purpose:

"An act to codify the laws relating to the laying out
of drainage districts, the consolidation of drainage dis-
tricts, the construction and maintenance of drains,
sewers, pumping equipment, bridges, culverts, fords,
and such structures and mechanical devices as will
properly purify the flow of such drains; to provide for
flood control projects; to provide for water management,
water management districts, and subdistricts, and for
flood control and drainage projects within such district;
to provide for the assessment and collection of taxes; to
provide for the investment of funds; to authorize public
corporations to impose taxes for the payment of assess-
ments in anticipation of which bonds are issued; to
provide for the issuance of bonds by drainage districts
and for the pledge of the full faith and credit of coun-
ties for payment of such bonds; to authorize counties to
impose taxes when necessary to pay principal and
interest on bonds for which full faith and credit is
pledged; to validate certain acts and bonds; and to
prescribe penalties for violations of the provisions of
this act."

Thus, it is clear that, while permitting the exis-
tence of some private drains, the Legislature has
seen fit virtually to pre-empt the field of planning,
design, construction, and maintenance of storm
and waste water drains in this state by enacting
mandatory provisions in the Drain Code coordinat-

ing the location, construction, and financing of drains, and even authorizing the condemnation of property for their construction.[6]

The statute is a persuasive indication that, in the judgment of the Legislature, to which we owe considerable deference, the coordinating effect of a compulsory state law is necessary to assure the preservation of "the public health, convenience and welfare" in connection with the construction and maintenance of such drains.

We are of the view, therefore, that whether measured by the notion that the construction of the drain in question was for the "common good of all", or by the standard that "the purpose, planning and carrying out of the activity" in question "due to its unique character or governmental mandate, can be effectively accomplished only by the government", the conclusion is inescapable that the activity in which the drainage district was engaged at the time of plaintiff Michael Ross's injury was a "governmental function" for which the district is immune from tort liability.

Accordingly, the judgment of the Court of Appeals should be reversed.

WILLIAMS and COLEMAN, JJ., concurred with RYAN, J.

KAVANAGH, J. *(for affirmance).* There are many activities contributing to the common good which are engaged in by state agencies. Providing a comprehensive system of drains is surely one of them. As in the case of supplying water, power, transportation and other services sometimes supplied by public utilities, however, the fact that a

---

[6] Representative examples of some of the mandatory provisions of the Drain Code are found in §§ 52 and 72, and §§ 73-78.

state agency engages in an activity does not convert the activity into a function of government.

Accordingly we would affirm the Court of Appeals.

FITZGERALD, C.J., and LEVIN, J., concurred with KAVANAGH, J.

The late Justice BLAIR MOODY, JR., took no part in the decision of this case.